[Civ. No. 16142.   Second Dist., Div. Three.   Sept. 13, 1948.]

NICK N. MURR, Appellant, v. IDA K. MURR, Respondent.

William A. Reppy for Appellant.

Halverson & Halverson for Respondent.

WOOD, J.—Plaintiff commenced this action for divorce upon the ground of extreme cruelty, specifying that defendant gave birth to an illegitimate child on January 21, 1944 (about two years after the marriage). Defendant answered, denying the allegation of the complaint that there was no issue of the marriage, and alleging that there was born to plaintiff and defendant one child who was born on January 21, 1944. Defendant also filed a cross-complaint for divorce on the ground of extreme cruelty, specifying, among other things, that plaintiff had maliciously denied that he was the father of the child.

The court found that there was one child born to plaintiff and defendant as the issue of the marriage, and that said child was born on January 21, 1944; that defendant did not give birth to an illegitimate child; that defendant had not been guilty of any cruel treatment of plaintiff; that plaintiff had been guilty of cruel treatment of defendant, in that, among

other things, he contracted a venereal disease while he was in the Navy and that he maliciously denied that he was the father of the child. An interlocutory decree of divorce was granted to defendant upon her cross-complaint, and it was ordered therein that plaintiff pay to defendant for the support of the child the sum of $7.50 per week until the child becomes of age.

Plaintiff appeals from the judgment. He contends (1) that the evidence was insufficient to support the judgment; (2) that this court should hold as a matter of law that the period of gestation, which could have been attributed to coition with plaintiff, was so short that plaintiff could not be the father of the child; (3) that the trial judge abused his discretion in denying plaintiff's motion for a continuance, and in denying plaintiff's motion for a new trial; and (4) that plaintiff did not get a fair trial by reason of the bias and antagonistic attitude of the trial judge.

Plaintiff and defendant were married on December 28, 1941. Plaintiff enlisted in the Navy on February 10, 1942, and thereafter the parties were absent from each other until the wife visited him in New Jersey for approximately two weeks in January, 1943. Thereafter they were absent from each other until he visited the wife in Los Angeles from the 15th or 17th of July, 1943, to the 22d of July, 1943. Thereafter they were absent from each other until November, 1944. The wife gave normal birth to a mature child, weighing 6¼ pounds, on January 21, 1944, which date was 190 days after July 15, 1943, or 188 days after July 17, 1943. The birth certificate, made by the attending physician, Dr. Rue, stated that the pregnancy was a nine-months' pregnancy. The wife testified that she had never had sexual intercourse with anyone other than her husband.

Section 1962 of the Code of Civil Procedure provides in part that: ''The following presumptions, and no others, are deemed conclusive: . . . 5. The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.'' Section 1963 of the Code of Civil Procedure provides in part that: ''All other presumptions are satisfactory, if uncontradicted. They are denominated disputable presumptions, and may be controverted by other evidence. The following are of that kind: . . . 31. That a child born in lawful wedlock, there being no divorce from bed and board, is legitimate.'' In *Estate of McNamara,* 181 Cal. 82 [183 P. 552, 7 A.L.R. 313], the court was considering whether the presump-

tion of legitimacy was conclusive or disputable, under circumstances where the period of gestation was 304 days and the birth of the child was not within the normal or usual operation of the laws of nature. The court therein held (p. 95) that the presumption was not conclusive, and that the presumption was conclusive only when the birth of the child came within the normal period of gestation. In *Estate of Walker,* 180 Cal. 478 [181 P. 792], the court held (p. 491) that the presumption of legitimacy should be considered conclusive if the husband and wife were cohabiting and it was possible under the laws of nature for the husband to be the father of the child. It was also said therein (p. 491) that "[I]t is always permitted to show that it was not possible by the laws of nature for the husband to be the father, as by showing impotency on his part, want of intercourse during the possible period of conception. . . ." ■ As above stated, in the present case the period of gestation was 188 or 190 days. In *Dazey* v. *Dazey,* 50 Cal.App. 2d 15 [122 P.2d 308], it was said at page 20, in referring to a medical textbook, that " 'It is customary to reckon the length of pregnancy as nine calendar months, or ten lunar months, two hundred and eighty days' duration, dating from the first day of the last menstruation.' " It was also said therein, at page 20, that: "This author also plainly states that if we compute the period from fruitful coition to birth, it [period of gestation] varies from 220 days to 330 days." The attending physician, called as a witness by defendant, testified that, in determining the date when a child will be born, the members of the medical profession count 280 days from the last menstrual period, but if they could actually know the date of fruitful coition they would count the time of delivery from that date; that there is no recognized rule in the medical profession that the periods of pregnancy range from 220 days to 330 days; that there is no hard and fast rule limiting the periods of pregnancy; that he would not consider it an average case if a child were born 190 days after fruitful coition, but he would not say that it was an abnormal case. Under the circumstances here, the presumption as to legitimacy should be regarded as disputable. Section 195 of the Civil Code provides as follows: "The presumption of legitimacy can be disputed only by the husband or wife, or the descendent of one or both of them. Illegitimacy, in such case, may be proved like any other fact." There was no evidence that the child was born prematurely.

█ A certified copy of the birth certificate is prima facie evidence of the facts stated in it (Health & Saf. Code, § 10551), and therefore the certificate herein is prima facie evidence that the pregnancy was of nine months' duration. █ A mature child having been born after an alleged gestation period of six months and ten days, which period according to authoritative medical opinion was about one month shorter than the shortest known period of gestation for such a birth, and the birth certificate being prima facie evidence that it was a nine-months' pregnancy, the trial court should have been most careful, by reason of the close question of fact involved, to accord to the plaintiff a fair and full opportunity to present his evidence. The plaintiff was not accorded a fair trial and a full opportunity to present his evidence. Before discussing the manner in which the trial was conducted, the substance of the evidence should be stated.

The husband testified that while he was in the Navy he destroyed the letters which he had received from his wife; that he first received knowledge in August, 1943, that his wife was pregnant; that she said in a letter that the child was born prematurely; that when he wrote the letters that were received in evidence (wherein he made statements indicating that the child was his) he took it for granted that the child was his; that when he returned home in November, 1944, he told his wife that he knew it was a normal nine-months' child; that he went with his wife to the doctor's office to see him about the case, but the wife went in to see the doctor and came out and said that he could not see the doctor and that the best way to get information on the case was to get a birth certificate; that he got the certificate, and then observed that it was a nine-months' child; that he had a talk with her about the certificate, and she told him that she was on a party and got drunk and did not know what she was doing and made a slip, that she had made a mistake, and that he was not the father of the child; that he then told her that he had made a mistake himself and had contracted syphilis while he was in the Navy, but that he had been cured; that she then said she would sue for divorce; that he had been home several days and had had sexual intercourse with his wife before he told her that he had contracted syphilis; that she would not sleep with him the night following the time he told her about syphilis, and he left home the next morning and had never returned.

A witness, Mrs. Finnoe, called by plaintiff, testified that in June, 1943, the wife told her that she (the wife) was a month or two pregnant at that time; that in June, 1943, she saw the wife and a sailor come out of a theater; and that in July, 1943, she saw the wife with another sailor in a cafe drinking beer, that she saw the wife kiss the sailor, and that the wife's dress was unbuttoned down the front.

Another witness called by plaintiff, Mr. Finnoe, who was the husband of the witness last mentioned, testified that in June, 1943, he saw the defendant as she was coming out of a theater with a sailor; that on another occasion in 1943 he saw her in a cafe with a man and that they were drinking together and having a big time.

The wife denied the statements attributed to her by the husband in his testimony to the effect that he was not the father of the child, and that she had had relations with another man. She also denied the testimony of said two witnesses called by the husband. She also testified, in addition to her testimony mentioned hereinabove, that after her marriage she had not gone out with any man other than her husband; that her husband was the father of the child; that she did not know that she was pregnant until she went to see Dr. Rue about her pregnancy on August 26, 1943; that the only consultation that she had with the doctor was about her pregnancy and that consultation was on August 26, 1943, and that she had no other illness that summer; that she did not notify her husband that she was pregnant until after she had been to see the doctor; and that she received several letters from him after she had so notified him and after the child was born. The letters, which were received in evidence, contained affectionate expressions regarding the wife and the child. She also testified that he never mentioned to her the matter of legitimacy or illegitimacy of the child; and that he told her to get a divorce on the ground that he had a contagious disease.

The wife's two sisters and another lady, called as witnesses by the wife, gave testimony which tended to corroborate her testimony that she had not gone out with, or been in the company of, any man other than her husband.

The attending physician, called as a witness by the wife, testified, in addition to his testimony mentioned hereinabove, that his card record regarding the wife had been misplaced and he was unable to find it; that the wife first came to his office concerning her pregnancy on August 26, 1943, and at

that time he considered that she was about two months along; that he signed the birth certificate, but he did not have anything to do with respect to preparing it for signature; that the secretary at the hospital prepared it and he signed it; that it was customary for the secretary to obtain the information for the birth certificates and to prepare them and to hand several of them to him for signature at the one time, and that he would then sign them; that the pregnancy and the birth in this case apparently were normal; and that two of the wife's sisters were pregnant at the same time the wife was pregnant, and they were also his patients and were in his office at various times.

On several occasions during the trial and at times when plaintiff's attorney was asking material questions or making proper objections, the trial judge stated that the attorney was taking too much time for the trial of a divorce case. Soon after the trial had started, as shown on page 19 of the reporter's 188-page transcript, the judge said: "How much more time are we going to waste on this?" and "You both know what is going to happen, so let us get through as quickly as possible." At another time the judge said to plaintiff's attorney: "Well, it seems to me you must be getting paid by the hour, and want to waste as much of the Court's time as possible." At another time he said: "I suggest that if you have any evidence to prove your complaint that you put it on, and not waste so much time." He also said: "I do insist, that if you have any evidence . . . to the effect that the Cross Complainant bore a child of which the plaintiff was not the father, that you put that evidence on. So far you haven't put one bit of evidence on in support of it . . .." At another time he said: "Have you any evidence in support of your complaint?" He also said to counsel for plaintiff: "Mr. Reppy, cannot you try the case without wasting so much time? This case should have been tried in 10 or 20 minutes, just like an ordinary divorce case." Counsel for plaintiff replied: "If we didn't have the issue of paternity it would have been tried within that time." The judge then said: "You had better forget that." Counsel for plaintiff said: "I will ask just a few more questions." The judge said: "Make them as few as possible . . . I am getting pretty tired of having you waste the Court's time." On another occasion the judge said: "I have tried many thousands of these cases. I cannot remember one that has taken as much time as this case." Later the

judge said: "Well, I am going to state for the record that you have been wasting the Court's time so unconscientiously in this case, and . . . there are several hundred lawyers . . . who would not have wasted so much time in this case."

On several occasions during the trial the judge indicated that he had already decided the case. Soon after the trial started (p. 19 of reporter's transcript), as stated above, the judge said: "You both know what is going to happen, so let us get through as quickly as possible." That statement indicates that the judge had theretofore decided the case and had told both attorneys what his decision would be. The attorney for appellant states in his brief, and it is not denied by respondent, that the judge had advised counsel in chambers before "the case" that there was no point in the husband making the contention in his court that the child was a bastard. At another time, after the judge had commented to the effect that it was a peculiar case in that the plaintiff had acknowledged the child in his letters and then in the action had denied that it was his child, the attorney for plaintiff said that plaintiff had an explanation. Thereupon the judge said: "He will have to have an awfully good explanation." The judge then announced a recess until the next day and said: "You had better think over what I have said." Plaintiff's attorney asserts in his brief, as above stated, that said reference to "what I have said" was a reference to said statement, above mentioned, made by the judge in chambers before the trial started. At another time after the judge had commented again regarding the letters written by plaintiff, and after plaintiff's attorney had stated that plaintiff would explain the letters, the judge said: "Well, he will have to do a lot of explaining, and the Court still has the presumption to rely on, that the child is presumed to be the child of the party." That statement indicates that irrespective of any explanation that the plaintiff might make the judge would rely on the presumption in support of his then existing opinion that plaintiff was the father. On another occasion the judge said: "After hearing the testimony [before the testimony was concluded] I haven't the slightest doubt but that it was" a legitimate child. At that time he also said: "The only specific instance of cruelty pled by the plaintiff was that the wife bore this child that he claims was illegitimate, and that disposes of his case, because that allegation is not true." At another time the judge said:

"[T]he more you develop your case the more certain I am that you haven't any case." At another time, in referring to a statement of plaintiff's attorney that if he did not have the issue of paternity he could try the case in a shorter time, the judge said: "You had better forget that."

On occasions when plaintiff's attorney offered testimony for the purpose of impeaching the defendant, the judge made statements to the effect that even if he did impeach her the question still remained as to whether the child was legitimate, and that the court could still rely on the presumption that the child was legitimate. (The judge did say during the trial that he did not regard it as a conclusive presumption.) On one occasion after plaintiff's attorney had offered testimony as shown above that defendant had, contrary to her testimony, been out with a man other than her husband, the judge asked if he had any evidence to prove the allegations of his complaint, and the attorney replied that he wanted to impeach the defendant. Thereupon the judge said: "All right; suppose you impeach her all the way around, you just still haven't got away from these letters that this man wrote admitting that the child was his," and "the Court still has the presumption to rely on." On another occasion plaintiff's attorney asked if she knew where plaintiff was on August 27, 1943 (that being the date of a letter from plaintiff wherein he referred to the expected child). The judge asked how that could be of any help in deciding the matter. The attorney for plaintiff replied in effect that he wanted to show that there was a discrepancy between defendant's testimony and the fact as to the time when defendant notified plaintiff that she was pregnant,—it being the attorney's intention, as then indicated to the court, to show that plaintiff was located so far away in the Navy that the reference in his letter of August 27th to the expected child would indicate that he had been notified of defendant's pregnancy much earlier than August 26th (that being the date after which defendant had notified plaintiff, according to her testimony). Thereupon the judge said: "Well, suppose there was [a discrepancy]."

The conduct of the judge in adjudging one of plaintiff's witnesses guilty of contempt of court and sentencing her to five days in jail, when the witness said she did not want to answer a certain question, and his conduct in calling her a liar after she had testified, tended to intimidate the witnesses and to prevent a full presentation of the evidence. When plain-

tiff's attorney was attempting to impeach the defendant, and after Mrs. Finnoe had testified that she had seen the defendant kiss a man, the witness, Mrs. Finnoe, testified that the defendant's clothing was not properly arranged at the time she was with the man. Thereupon the judge said: "What did you see? I am gettin tired of all this petty gossip. What did you see?" The witness said that she would rather say no more. Then the judge said: "Well, will you tell us what you saw there, or do you want to go to jail for contempt?" The witness said: "I don't want to say, your Honor." The judge said: "All right; you are adjudged guilty of contempt of court, and sentenced to jail for five days, unless you tell me exactly what you saw." The witness then said: "Well, she had her dress unbuttoned down the front, and when she talked it exposed her." Then the following occurred: "The Court: Have you got anything but just innuendo in this petty gossip? Mr. Reppy: Well, I had a different story from the witness, your Honor. The Court: Well, I will remit the contempt business, but I wish if you have any evidence you will put it on. If you have any real evidence to put on, I would like to have it. Mr. Reppy: Well, she [defendant] testified, your Honor, that she never did any of those things. I want to show your Honor that she did." Then after some discussion between the judge and plaintiff's attorney regarding impeachment of the defendant and the proposed explanation of plaintiff's letters, the plaintiff's attorney said he wanted to ask Mrs. Finnoe another question. Thereupon the judge said: "Well, if you did ask her I wouldn't believe her. I think I know a liar when I see one." No further question was asked that witness.

Next thereafter, Mr. Finnoe was called as a witness and after testifying as above stated, that he saw the defendant and a sailor come out of a theater and that he saw defendant and a man in a cafe drinking together, he said that he did not remember anything as to the conduct of defendant and the man in the cafe except that they were drinking.

It is therefore clear that such conduct on the part of the trial judge deprived the plaintiff of a fair trial. In such a case, which included close questions pertaining to the laws of nature and to medical science, the judge's comment that the case should be tried in 10 or 20 minutes and his many other ill-advised and unnecessary comments with respect to wasting his time establish definitely that he did not consider that the issues presented by plaintiff were worthy of consideration. The

judge's comments, before the case was submitted to him, such as those that both attorneys "know what is going to happen," and "that disposes of his case" because the allegation regarding illegitimacy is not true, and that plaintiff "had better forget" the issue of paternity, clearly indicate that he had prejudged the case. The comments of the trial judge to the effect that it was unimportant whether defendant was impeached, indicates that he refused to consider all the evidence. The trial judge was wholly unjustified in adjudging one of plaintiff's witnesses guilty of contempt of court. His conduct in adjudging her guilty of contempt, sentencing her to jail, and calling her a liar prejudicially affected plaintiff in the presentation of his case. The foregoing prejudicial conduct of the trial judge is corroborative of the opinions relative to such conduct heretofore expressed in the cases of *Etzel* v. *Rosenbloom*, 83 Cal.App.2d 758 [189 P.2d 848] and *Podlasky* v. *Price, ante,* p. 151 [196 P.2d 608].

The trial judge abused his discretion in denying plaintiff's motion for a continuance, which motion was made in order to produce further testimony by the attending physician. After the defendant had finished her testimony and had rested her case, the attorney for plaintiff stated that he wanted to recall Dr. Rue in rebuttal. The doctor was not present at that time. The attorney for plaintiff stated that he did not ask the doctor to return, at the time the doctor was in court, because the attorney did not have knowledge at that time of the facts he desired to present. Thereafter the following occurred: "Mr. Reppy: If the Court please, as I stated, the other witness that I wished to call is Dr. Rue, and if you will permit me to again 'phone his office, I will attempt to have him here. The Court: Why didn't you have him here? Why didn't you ask him to stay here? Mr. Reppy: As I told you, your Honor, I didn't have possession of the facts that I have now. If your Honor wants me to, I will make an offer of proof. The Court: You may do that. Mr. Reppy: I expect to prove that if Dr. Rue testified, were called and testified, that he would bring his date book with him, and that it would disclose, and he would testify that Mrs. Ida Murr consulted him at his office on June 28th, 1943. The Court: Well, what of it? Mr. Reppy: She testified, your Honor, that she consulted him only on the question of her pregnancy, and that she has not consulted him for any other purpose. The Court: Well, what of it? Mr. Reppy: I will tell you: that was before

Mr. Murr came home on his leave, when he had access to his wife, and she consulted him prior to the time that he came home. The Court: Consulted him for what? Mr. Reppy: For her pregnancy. Mr. Halverson [counsel for defendant]: I am sure that Dr. Rue will testify to no such thing. Mr. Reppy: I have just been talking with his nurse. The Court: Well, I am going to state for the record that you have been wasting the Court's time so unconscientiously in this case, and I do not think that I am exaggerating when I say that there are several hundred lawyers that appear over in Department 1 who would not have wasted so much time in this case. Mr. Reppy: Well, I would like a continuance of the case, your Honor, to get Dr. Rue here. The Court: I am not inclined to·grant any continuance, because the Doctor was here and you didn't ask him to stay. Mr. Reppy: I didn't know the facts at that time. The Court: You should have. Anything further? Mr. Reppy: No, your Honor. Mr. Halverson: No, your Honor. The Court: Submitted? Mr. Reppy: I have made the offer of proof, your Honor. The Court: The Court has denied it because there is no legal showing, and no legal showing has been made for a continuance of this matter. Mr. Reppy: If your Honor will permit me to I will be sworn and testify as to how I obtained the information, and when. The Court: Wouldn't that be more hearsay? Mr. Reppy: Only hearsay to this extent, that I will have to testify as to my conversation with the doctor and his nurse to show you how I obtained the information. The Court: If I heard you testify to that, it still wouldn't change my view in the matter.'' The trial judge should have granted the continuance. The proposed evidence was very material in that if true it would have indicated that the defendant was pregnant in June before the plaintiff returned home in July.

█ The trial judge abused his discretion in denying plaintiff's motion for a new trial on the ground of newly discovered evidence. As above stated, Dr. Rue testified that he had lost his card record relating to defendant. He testified by refreshing his memory from notes that were made at the time he discussed the matters prior to the trial. An affidavit of the attorney for plaintiff, filed in support of the motion, shows that he did not interview the doctor prior to the trial because he considered that the relationship between the doctor and defendant was confidential; that after the doctor had testified at the instance of defendant concerning her pregnancy, the attorney considered that the defendant had waived the right

to regard the relationship as confidential and that he was then entitled to discuss the matter with the doctor; that after the doctor had testified and before the case was submitted for decision, the attorney requested the doctor to locate a daybook or some record which would show when defendant first visited his office in 1943; that in the morning of the following day, which was the last day of the trial, the doctor's nurse told the attorney that the doctor had located a daybook which indicated that defendant had consulted the doctor on June 28, 1943; that after the decision in the case, the attorney again visited the office of the doctor and found that the doctor had located his record which he kept in the regular course of his profession, and that the attorney copied the record insofar as it related to matters material herein, and that the record reads in part as follows: "Murr, Mrs. Ida 116 No. Bixel 6-28-43 Uterus tipped backward . . . has not menstruated since — May 19— . . . 6-28-43 Will return in 3 wks for examination    Aug. 26, 1943 Uterus size of 3 mo. pregnancy . . ."; that the attorney could not have obtained the record earlier because the doctor himself could not locate it; that the daybook entry of June 28, 1943, and the patient's card record were material for the reason defendant testified that she visited the doctor in regard to her pregnancy and for no other reason. An affidavit of Dr. Rue, filed by plaintiff in support of the motion, shows that after the decision in the case the doctor located the card record of defendant; and that, among other things, the card contains items specifically relating to the pregnancy of the defendant.

A counteraffidavit of Dr. Rue, filed by defendant in opposition to the motion, states that on the face of the folded card record relating to defendant the following appears: "Murr, Mrs. Ida . . . 116 No. Bixel, City"; that on the back and inside of the card certain information, specifically stated in the affidavit, appears; that a date notation, "6-28-43," is written diagonally across the upper left corner of the inside page; that said date "was evidently written at a later date as the next following date is 12-28-42"; and that omitting the diagonally written date, the history would indicate that the record made on the upper third of the sheet should bear a 1942 date, the same as the preceding page and the paragraph following. An affidavit of one of the defendant's sisters, filed in opposition to the motion, stated that she accompanied defendant to Dr. Rue's office on August 26, 1943; and that

she accompanied another sister, Mabel Murr (the wife of plaintiff's brother), to Dr. Rue's office on June 28, 1943.

Under the circumstances of this case, where as above shown a close question of fact was presented by reason of the birth of a mature child after such an alleged short period of gestation, the daybook and the card record were very material evidence. If defendant did consult the doctor on June 28, 1943, as indicated by the daybook and card record, that would be a very material circumstance in determining whether she was pregnant before the plaintiff returned home in July, 1943, especially in view of her testimony that she consulted him in 1943 in regard to pregnancy only. Also such evidence would tend to impeach the defendant, since she said the first time she consulted the doctor in 1943 was August 26th. Furthermore, it is to be noted that the card record indicates that on August 26, 1943, the defendant was three months pregnant. That circumstance would also be a very material circumstance in determining whether she was pregnant before plaintiff returned home in July, 1943.

For the foregoing reasons the judgment is reversed and the cause is remanded for a new trial.

Shinn, P. J., and McComb, J. assigned, concurred.