IRENE M. KOWALSKI, PLAINTIFF-APPELLANT, v. HENRY WOJTKOWSKI, DEFENDANT-RESPONDENT.

Argued March 7, 1955—Reargued May 16, 1955—
Decided June 27, 1955.

*Mr. Nathan Reibel* argued the cause for appellant.

*Mr. Perry E. Belfatto* argued the cause for respondent (*Mr. Julius Wildstein* and *Mr. Laurence N. Rosenbaum,* on the brief).

The opinion of the court was delivered by

HEHER, J. The basic issue here concerns the status before the law of minor children conceived during wedlock but born (in Florida) shortly after the entry of a decree divorcing the children's mother and her spouse in a court of competent jurisdiction of Florida, of which state the parties were domiciliaries.

The mother of the children, now claiming "residence" in the City of Elizabeth, New Jersey, brought this action in the Juvenile and Domestic Relations Court of the county as within the jurisdiction conferred by *R. S.* 9:16–1 *et seq.,* as amended by *L.* 1953, *c.* 9; *R. S.* 9:17–1 *et seq.,* as amended by *L.* 1945, *c.* 183, *L.* 1949, *c.* 141, and *L.* 1953, *c.* 9; and *R. S.* 9:18–1 *et seq.,* even though she "has no legal settlement in Union County as defined in" *R. S.* 44:8A–3.

The complaint is in two counts: The first alleges that the children, twins, Richard and Christine, "born to the plaintiff, of which the defendant is the father, were conceived in the State of Florida, and were born to the plaintiff" there on July 30, 1953, and are now in her custody; and the prayer is for damages in reimbursement for lost "earnings from her employment" and the cost of medical care and hospitalization during pregnancy and convalescence, and a "reasonable attorney's fee," for which, it is said, she has an action under *chapter* 742 of the statutes of Florida. And the second count seeks a "determination" that the defendant is the father of the children and an order under the cited New Jersey statutes directing the "defendant father to support his children born out of wedlock."

The complaint was dismissed for want of jurisdiction; and plaintiff's appeal to the Appellate Division of the Superior Court is here for decision on our own motion.

The children were born in Florida on the day given, 36 days after the mother had obtained a divorce for extreme

cruelty from Stefan Z. Kowalski in Florida, then and ever since 1946 the place of their domicile. They were married November 8, 1943. Conforming to information supplied by the plaintiff-mother, the birth certificates, issued in Florida, give the children's surname as Kowalski and Stefan Z. Kowalski as their father. The defendant is a physician, practicing his profession in Union County, New Jersey. The child Christine is living with her mother in Elizabeth, New Jersey, where the mother is employed; Richard lives with his maternal grandmother in Passaic, New Jersey. Plaintiff testified that she had lived in Elizabeth since "Palm Sunday, the first or second Sunday in April, 1954." On February 3, 1954, some two months before, she had presented a similar petition for the selfsame relief alleging her residence to be in Florida; and the action was dismissed for lack of jurisdiction of the subject matter.

Judge Sachar directed a dismissal of the second suit now before us: the first count, for want of jurisdiction to "enforce the Bastardy laws" of Florida; and the second, for failure of proof of plaintiff's "legal settlement" in New Jersey, deemed a condition prerequisite to jurisdiction under *R. S.* 9:16–1 *et seq.* and *R. S.* 9:17–1 *et seq.* It was reasoned that the lower court was not empowered by statute to "enforce the remedy" provided by the Florida statute and, until the enactment of *R. S.* 9:16–1, only the overseer of the poor, representing the public, "could bring an action in connection with the establishment of the paternity of children," but under that act the mother of illegitimate children "who did not choose to make them a public charge" may bring an action for their support "in her own name and in a capacity not representative in any regard," yet *R. S.* 9:16 "did not change the basic requirement of the establishment of paternity under *R. S.* 9:17, and, in turn, the jurisdictional requirements and safeguards of the latter," and the plaintiff-mother here "must first establish * * * with all of the safeguards available to the defendant that he is 'the father,' 'the parent.'" These cases are cited: *Borawick v. Barba,* 7 *N. J.* 393 (1951); *State v. Weiss,* 11 *N. J. Super.* 250

(*App. Div.* 1951) ; *Hall v. Centolanza,* 28 *N. J. Super.* 391 (*App. Div.* 1953).

The argument *contra* is that under Article IV, section 2 of the Federal Constitution and the Fourteenth Amendment plaintiff, a citizen of the United States now resident in New Jersey, may sue in New Jersey to enforce the "right of action," termed a "property right," given a "natural mother" by the Florida statute, chapter 742, to require a "natural father" to support his children conceived and born in Florida but now in New Jersey, citing *Chambers v. Baltimore & Ohio Railroad Co.,* 207 *U. S.* 142, 28 *S. Ct.* 34, 52 *L. Ed.* 143 (1907) ; and at all events, as the mother having the exclusive custody of the "illegitimate" children under *R. S.* 9 :16–1, she may enforce by action in New Jersey the obligation laid upon the natural father by *R. S.* 9 :16–2 to support and educate children "born out of wedlock" to the same extent as if born in lawful wedlock.

On the original presentation of the cause, we asked for a reargument directed to the question of whether, under the substantive law of Florida, the children bear a status of legitimacy not open to attack in New Jersey by the action under review ; and the reargument was had in due season. And now the basic insistence is that under the law of Florida "legitimacy is a mere presumption and may be overcome by contrary and overriding evidence as is the law of New Jersey."

We have no occasion to consider whether an action would lie in New Jersey to enforce the remedy provided by chapter 742 of the laws of Florida, were the claim pleaded within the statute. Whether the proceeding be deemed civil or criminal in nature, or one having the characteristics of both, the generally accepted rule is that no action is maintainable on a foreign bastardy statute. Such is ordinarily an exercise of the police power to denounce misconduct or to shift the burden of support from society to the child's natural parent. *Graham v. Monsergh,* 22 *Vt.* 543 (*Sup. Ct.* 1850) ; *State of Indiana ex rel. Stone v. Helmer,* 21 *Iowa* 370 (*Sup. Ct.* 1866). See *People of State of New York v. Coe Mfg. Co.,* 112 *N. J. L.* 536 (*E. & A.* 1934). Cases of this class

are within the general rule that there cannot be extra-territorial enforcement of a right created by the law of a foreign state as a means of furthering its own governmental interests, of which a statute placing the burden of maintenance of a potential pauper on an individual, to the relief of the public, is also an example. *Restatement, Conflict of Laws, sections* 454, 455, 610. See also *Wharton's Conflict of Laws (3d ed.), section* 257*a*. We need not pause to deliberate the question whether the particular statute has different attributes, giving rise to personal rights of action not related to the indemnification of the public. The pleaded cause of action is not within the statutory category.

█ The children here, begotten as they were during wedlock, are deemed legitimate by the law of Florida. Chapter 742 is by its very terms inapplicable; and by Florida law the mother is precluded from repudiating the children's legitimacy.

As originally enacted in 1828, chapter 742, section 1 of the laws of Florida provided for certain relief concerned with the issue of paternity, the allowance of limited support and reimbursement for expenses attending birth, and so on, at the instance of any "single woman who shall be pregnant or delivered of a child, who by law would be deemed and held a bastard." By the *Laws of* 1951, *c.* 26949, this section was replaced by a provision, *c.* 742.011, that any "unmarried woman who shall be pregnant or delivered of a bastard child" may bring proceedings "to determine the paternity of such child," and have the relief prescribed by chapter 742.031, support for the child and confinement expenses, if there be a finding against the defendant putative father on the issue of paternity. And it was also provided, section 742.10, that "This chapter shall be in lieu of any other proceedings provided by law for the determination of paternity and support of bastard children."

The 1828 statute provided for an award "not exceeding $50 yearly" for the support of a bastard child, hardly more than a token contribution; the 1951 act, section 742.041, removed the limitation and authorized an allowance more in keeping

with the need. And when the later statute was considered by the Florida Supreme Court, Justice Terrell said there was "no reason for the new act except to provide a reasonable living scale for bastard children." *Wagner v. Baron,* 64 *So. 2d* 267, 37 *A. L. R. 2d* 831 (*Fla. Sup. Ct.* 1953).

Save as inconsistent with the Constitution and laws of the United States and the state legislative acts, the common and statute laws of England, "of a general and not a local nature, down to" July 4, 1776, are in force in Florida. *Florida Stat. Ann., chapter* 2. See *Coleman v. State ex rel. Race,* 118 *Fla.* 201, 159 *So.* 504 (*Sup. Ct.* 1935); *Knapp v. Fredricksen,* 148 *Fla.* 311, 4 *So. 2d* 251 (*Sup. Ct.* 1941).

At common law, the putative father was under no obligation to maintain his illegitimate offspring. The duty of support came by statute: first, on the motion of the overseer of the poor or other local representative to exonerate the municipality, and then at the instance of the mother or other interested person on behalf of the child itself, the latter a measure of relief conforming with others of the same pattern to a more enlightened concept of social justice as against the harsh medieval doctrine of *nullius filius* that, for the moral sin of the parents, set the unfortunate and innocent victim adrift with no standing whatever before the law.

In 1777 Lord Mansfield made his historic pronouncement: The law of England "is clear," he said, "that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage. * * * As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule, founded in decency, morality, and policy, that they shall not be permitted to say after marriage, that they have had no connection, and therefore that the offspring is spurious; more especially the mother, who is the offending party. That point was solemnly determined at the Delegates," who, prior to the *Act* 2 & 3, *Will.* 4, *c.* 92, constituted the Supreme Ecclesiastical Court of Appeal. *Goodright v. Moss, Cowp. pt.* 2, *pp.* 591, 592, 594, 98 *Eng. Reprint* 1257; 11 *Eng. Rul. Cas.* 518 (1777).

The principle was reaffirmed by the House of Lords in *Russell v. Russell* (1924) *A. C.* 687, 13 *BRC* 246. There, the Earl of Birkenhead said:

"We find the rule living and authoritative. We find its application to legitimacy proceedings everywhere conceded. * * * The rule as laid down is not limited to any special class of case. It is absolutely general in the comprehensiveness of its expression. It has no geographical qualification. It does not, for instance, lay down that where husband and wife are present in the same bed; the same bedroom; the same house; or the same town, the evidence must be repelled; but that it may on the other hand be received if the husband has (for instance) been absent from the country for twelve months before the birth of the child. It says, upon the contrary, that such evidence shall not be given at all; and the reason given is that it would tend, if given, to bastardize the issue and to invade the very special sanctity inherent in the conjugal relation; and the reason is assigned which led first the Delegates and then the ordinary Courts to a conclusion so widely expressed. It is a reason founded upon 'decency, morality, and policy.' This passage from the judgment of Lord Mansfield has not the meaning ascribed to it by the Court of Appeal. * * * What Lord Mansfield meant was that a deeply seated domestic and social policy rendered it unbecoming and indecorous that evidence should be received from such a source; upon such an issue; and with such a possible result."

See *Rex v. Reading* (1734) *Cast. temp Hard.* 79, 82, 95 *Eng. Reprint* 49, a pauper settlement case, modified by Lord Mansfield's rule; *Rex v. Sourton* (1836) 5 *Ad. & El.* 180, 188, 111 *Eng. Reprint* 1134, involving the settlement of a pauper infant, the question of which of two parishes should be responsible for the maintenance of the child depending on the question whether the child was legitimate or not; *Rex v. Kea* (1809), 11 *East.* 132, 103 *Eng. Reprint* 954, also a pauper settlement case; and the *Poulett Peerage Case* (1903) *A. C.* 395, 399, where Lord Halsbury spoke of the rule which "most wisely and properly protects the sanctity of married intercourse and permits it not to be inquired into *in any Court of law*."

Lord Mansfield's judgment was referred to in *Russell v. Russell* as expounding "an ancient rule of the highest authority."

■ Such is in general the social philosophy that pervades the law of Florida. But the English rule has undergone substantial modification there; and on this inquiry we are bound by the law of Florida, the children's domicile of origin. To this end we must needs look to the pertinent and controlling statutes and decisional law of that jurisdiction. And we find the rule to be that the mother cannot illegitimate her children born during wedlock; but the husband or reputed father is not under the disability.

In 1934, the Florida Supreme Court declared:

> "By reason of the interest which the state has in the marital status of persons and the beneficial interests flowing to the state as an organized society from well-ordered and satisfactory home conditions, the circumstances seem to us to be more analogous to that condition in which through public policy a wife is not permitted to deny the parentage of children born during wedlock. She cannot repudiate their legitimacy. That right belongs only to the father, because maternity is never uncertain. She may only contest the identity of the child. See 7 *C. J.* 953." *Gossett v. Ullendorff*, 114 *Fla.* 159, 154 *So.* 177 (*Sup. Ct.* 1934).

The rule was reiterated in 1944:

> "The appellant husband claims he is not the father of the child. Where a child is born in wedlock the law extends the right to the reputed father to contest the parentage but the mother has no such right. She being restricted, to question the identity of the child only. * * * Where the legitimacy of a child born in wedlock is questioned by the husband and reputed father, one of the strongest rebuttable presumptions known to the law is required to be overcome before the child can be bastardized." *Eldridge v. Eldridge*, 153 *Fla.* 873, 16 *So.* 2d 163 (*Sup. Ct.* 1944).

And in the early case of *Ex parte Hayes*, 25 *Fla.* 279, 6 *So.* 64 (*Sup. Ct.* 1889), on *habeas corpus* brought by a defendant convicted under the act, the Supreme Court said:

> "In this case the only essential averments are that the prosecutrix is a single woman, that on a certain day she was delivered of a live child, and that the petitioner is the child's father. All that may be true, and yet not make out a case of bastardy. When the child was begotten she may have been, for aught that appears, a married woman, either of the petitioner or of some other man,

and if she was it was not a bastard, for the law is that 'a bastard is one that is not only begotten but born, out of lawful matrimony.' 1 *Bl. Comm.* 454. Hence the statute requires that it must be 'a child who by law would be deemed and held a bastard.' "

The bar extends to any action by the mother to have the children adjudged illegitimate. A similar statute in Illinois was so applied:

"The father of a bastard child at common law was not under any legal obligation to support his illegitimate child. He is only made liable under our statute where the mother is an unmarried woman. * * * Again, a married woman will not be permitted to bastardize her own offspring, born in wedlock. 'For reasons of public decency and morality, a married woman cannot say she had no intercourse with her husband, and that her offspring is spurious.' * * * This prohibition does not only apply to her competency as a witness, but it is a rule of law governing any right of action which she may set up, involving such bastardism of her own offspring, born in wedlock. The presumption is that a child born in wedlock is legitimate, and this presumption the mother will not be heard to deny." *Vetten v. Wallace,* 39 *Ill. App.* 390 (*D. Ct. App.* 1890).

This case was followed in *Flint v. Pierce,* 136 *N. Y. S.* 1056 (*Sup. Ct.* 1912), where the circumstances were in substance the same as here. It was held that at common law, absent a statutory modification, the mother of a child conceived in lawful wedlock, but unmarried when she brought her suit, did not have a right of action against the putative father to disestablish the legitimacy of her child and charge him with support as the natural father. It was said that the legitimacy of the plaintiff's own son "is so conclusively presumed that she cannot rebut it and thereby secure a cause of action." To the same effect: *Gaffery v. Austin,* 8 *Vt.* 70 (*Sup. Ct.* 1836).

And in Louisiana, as in Florida, the mother has no right to disavow a child in such circumstances, because maternity is never uncertain; she can only contest the identity of the child; the right of disavowal is peculiar to the father. *Eloi v. Mader,* 1 *Rob.* 581, 38 *Am. Dec.* 192 (*La. Sup. Ct.* 1841); *Succession of Barth,* 178 *La.* 847, 152 *So.* 543 (*Sup. Ct.* 1934), 91 *A. L. R.* 408. See annotation in 1 *A. L. R.* 1933.

*In re Ruff's Estate*, 159 *Fla.* 777, 32 *So.* 2d 840, 175 *A. L. R.* 370 (*Sup. Ct.* 1947), invoked by appellant, is not to the contrary. That was not an action by the mother to nullify her children's status of legitimacy, but was rather a proceeding by the heirs of her husband to augment their distributive share by overthrowing the presumption.

Thus it is that we do not have here an inquiry as to legitimacy governed as to proof by the law of the forum. Rather, we are concerned, as said in the *Restatement, Conflict of Laws, section 595, comment c,* with an irrebuttable or conclusive presumption which is in reality a rule of substantive law stated in the form of a presumption, just as much so as the parol evidence rule. *Atlantic Northern Airlines v. Schwimmer*, 12 *N. J.* 293 (1953). See also *Alcaro v. Jean Jordeau, Inc.*, 138 *F.* 2d 767 (3 *Cir.*, 1943). It is plainly a matter, not of procedure alone, but of substance related to the security of the status of legitimacy so cherished by its possessors when the age of reason and understanding comes and a condition or quality of the essence of the socio-familial policy basic to our culture and civilization. It is an inseparable attribute of the status of legitimacy accorded the children by the law of their domicile of origin; and it does not lose force or efficacy as its possessors move from one jurisdiction to another, depending upon the law of the particular jurisdiction. It would be repugnant to reason and elemental justice were legitimacy to depend upon varying local standards that would come to bear as the subject's domicile changed.

The domicile of origin "comes into being as soon as the child becomes at birth an independent person; and if the child is legitimate the domicil is that of the father," but if the child is illegitimate it takes its mother's domicile; a person "can have but one domicil of origin, which continues always to be the domicil fixed at birth." *Beale's Conflict of Laws* (1935), *pp.* 128, 129, 131. The general rule being that the "law of the domicil regulates the status, if the father, mother, and child are all domiciled at the time of the child's *birth* in the same State, the law of that State will fix the

status. It is the law of the domicil at the time of the child's *birth* which controls, for the claim of his legitimacy is based upon the circumstances of his *birth in wedlock* (though unlawful)." *Minor, Conflict of Laws*; or *Private International Law* (1901), *section 98, Legitimacy, p.* 214. The question of legitimacy *vel non* "is to be decided exclusively by the law of the domicil of origin." *Story, Conflict of Laws* (*8th ed.* 1883) *section* 93. The rule has general acceptance. *Restatement, Conflict of Laws, section* 14. *"Status"* means, *Ibid. section* 119, "a legal personal relationship, not temporary in its nature nor terminable at the mere will of the parties, with which third persons and the State are concerned;" and children legitimate in the state of their domicile of origin must be recognized as legitimate in the state of the forum. *Ross v. Ross,* 129 *Mass.* 243 (*Sup. Jud. Ct.* 1880); *Harding v. Townsend,* 280 *Mass.* 256, 182 *N. E.* 369 (*Sup. Jud. Ct.* 1932).

Vice-Chancellor Pitney, citing the Massachusetts case of *Ross v. Ross,* among others, held that "a person declared to be a legitimate child of another, by the law of the State of the domicile, must be held to have all the rights of a legitimate child wherever he goes." *Dayton v. Adkisson,* 45 *N. J. Eq.* 603 (*Ch.* 1889).

In *Moore v. Saxton,* 90 *Conn.* 164, 96 *A.* 960 (*Sup. Ct. Err.* 1916), Prentice, C. J., said:

"It would be not only inconvenient, but also would, with the shifting conditions and uncertainties created, lead to unfortunate inequalities and positive injustice. Legitimacy and the right of inheritance would be subject to fluctuation according as the person or a decedent chanced to be domiciled in this or that place. They would be dependent upon boundary lines. One who was a legitimate child residing one side of an imaginary line constituting a state boundary would be liable to find himself branded as a bastard should he remove across that line. In the one place he would be entitled to inherit from or through his father; in the other not. In the one place his life would be free from stain; in the other the stain of illegitimacy would be cast upon him. In respect to these matters uniformity of status, following the person wherever one is, is of prime importance, and, in the interest of society, it should not be permitted to give place to unstable and shifting

conditions, save under circumstances which furnish strong and cogent reasons for such a course."

And in *Miller v. Miller*, 91 *N. Y.* 315 (*Ct. App.* 1883), Miller, J., said that a rule making for legitimacy in one state and illegitimacy in another "would render the right of inheritance, sanctioned by the law of the State where he resided, one of great uncertainty and fluctuation, and in many cases it would operate so as to produce great injustice." Elaborating the theme, he continued:

"The rule seems to be well settled that the law of the domicile of origin governs the state and condition of a person in whatever country he may remove to. The status of legitimacy which arises under the law of one nation is recognized by other nations according to the authorities. Story lays down the rule in his *Conflict of Laws* (*sec.* 93), that 'foreign jurists generally maintain that the question of legitimacy or illegitimacy is to be decided exclusively by the law of the domicile of origin.' He also says at *section* 93*b*: 'It seems admitted by foreign jurists, that as the validity of the marriage must depend upon the law of the country where it is celebrated, the status or condition of their offspring, as to legitimacy or illegitimacy, ought to depend on the same law, so that if by the law of the place of the marriage the offspring, although born before marriage, would be legitimate, they ought to be deemed legitimate in every other country for all purposes whatever, including heirship of immovable property.' Wheaton, in his *Law of Nations*, at *page* 172, says: 'Legitimacy or illegitimacy are among universal personal qualifications, and the laws of the State affecting all these personal qualities of its subjects travel with them wherever they go and attach to them in whatever country they may be resident.' The general current of authority favors the doctrine that * * * legitimacy follows the child wherever it may go. This rule is, as we have seen, fully sustained by the authorities to which we have referred. The learned Judge Story, in his '*Conflict of Laws*,' devotes nearly the entire fourth chapter, and no inconsiderable portion of the work, to the consideration of the question involved in the case at bar, and he asserts the rule, that if a person is legitimated in a country where domiciled, he is legitimate everywhere and entitled to all the rights flowing from that status, including the right to inherit. He arrives at this conclusion after an examination and exhaustive discussion of the subject and after a comparison of the views of different writers upon civil law, quoting extensively from the same."

See also *Chesire, Private International Law* (*4th ed.* 1952), 384, 385.

And it matters not that the marital bond was severed before the children were born. A legitimate child "is he that is born in lawful wedlock, or within a competent time afterwards." 1 *Black. Comm.* 446. The rule has its genesis in the maxim of the civil law, *pater est quem nuptiae demonstrant* (the nuptials show who is the father). "A bastard, by our English laws, is one that is not only begotten, but born, out of lawful matrimony." *Ibid.* 455. At common law a legitimate child is one "either born or begotten in wedlock"; *e converso,* an illegitimate child is one "neither begotten nor born in lawful wedlock." *Long, The Law of Domestic Relations* (3rd ed.) *sections* 251, 277.

Under the common law "only those children born or conceived in lawful wedlock are legitimate. * * * Where conception takes place during lawful wedlock, the subsequent dissolution of the marriage by death or divorce before the birth of the child does not affect its legitimacy." 4 *Vernier American Family Laws* (1936), *section* 240.

Such is the sense and significance of the Florida statute. Chapter 65, section 65.05, provides that a "decree of divorce" shall not render illegitimate the children "born during the marriage, except when it is rendered upon the ground set forth in paragraph nine of section 65.04 (that either party had a husband or wife living at the time of the marriage sought to be annulled) in which case the marriage shall be invalid from the beginning and the issue illegitimate." Compare *Capraro v. Propati,* 127 *N. J. Eq.* 419 (*E. & A.* 1940).

We have taken judicial notice of the laws of Florida pursuant to *N. J. S.* 2A:82–27, 28, the uniform law. See *Franzen v. Equitable Life Assurance Society,* 130 *N. J. L.* 457 (*Sup. Ct.* 1943); *Leary v. Gledhill,* 8 *N. J.* 260, 270 (1951); *Colozzi v. Bevko, Inc.,* 17 *N. J.* 194 (1955).

The action here is in contravention of the condition of legitimacy grounded in the laws of the children's domicile of origin, and so is not maintainable under the New Jersey statutes.

New Jersey's interest in the support of children within its borders cannot be made to override the status of legitimacy accorded children born in lawful wedlock by the laws of the domicile of origin. Here, the divorced husband and reputed father has not undertaken to disestablish the legitimacy of the children; and he is not a party to this proceeding. Affirmed.

WILLIAM J. BRENNAN, JR., J. (dissenting). I think the first count, pleading an alleged cause of action under the Florida bastardy statute, was properly dismissed. The generally accepted rule that no action is maintainable on a foreign bastardy statute applies. I dissent, however, from the conclusion reached by my colleagues that the action pleaded in the second count, grounded on *N. J. S. A.* 9:16–1 *et seq.*, is not maintainable by this plaintiff.

This is not a case concerning the legitimacy of children born to a couple whose form of marriage (a common law marriage, for example) is recognized where the children were born but not in the forum; in such case the considerations adverted to by my colleagues unquestionably apply. Here, however, we must accept as true, for the purpose of this appeal, the allegations that defendant and not plaintiff's former husband is the father of the children and that the parties and the children are residents of this state. Plaintiff's counsel informed us on the reargument that her proofs would show that her husband was a merchant seaman at sea at all times when the children could have been conceived. Under that state of facts *N. J. S. A.* 9:16–1 *et seq.* applies and the mother of the bastard children, though married to another when the children were conceived, may maintain an action to compel the putative father to provide for the support and education of the children. The mother is not required to show a "legal settlement" as defined in *N. J. S. A.* 44:8A–3 to 6; her residence in Union County is enough. Proof of "legal settlement" is requisite only when an action is brought by the overseer of the poor or the director of welfare, to relieve the public purse of the burden of supporting the

children. See *State v. Weiss*, 11 *N. J. Super.* 250 (*App. Div.* 1951); *Hall v. Centolanza*, 28 *N. J. Super.* 391 (*App. Div.* 1953); *N. J. S. A.* 9:17–1 *et seq.*

Defendant concedes that the fact that the plaintiff mother was married to some one other than the defendant when the children were conceived would not have barred her action under *N. J. S. A.* 9:16–1 *et seq.*, if she and her husband and the defendant were residents of this State at that time and continued to be up to the time she brought this action. Although the mother and the defendant and the children were residents here when the action was instituted, thus satisfying the requirements of our statute according to its terms, defendant in an attempt to defeat plaintiff's standing to maintain this suit seizes upon the fact that plaintiff and her husband were Florida residents at the time of the children's conception.

My difference with my colleagues is basically that I do not agree that Florida law raises a conclusive presumption that these children are legitimate. England and America for centuries have interposed barriers against the attempts of wedded parties to bastardize issue conceived or born during the marriage, but never the barrier that children are conclusively presumed to be legitimate and that their illegitimacy cannot be established under any circumstances. The barriers actually erected still exist in most jurisdictions, but some have been removed in many. In this State, for example, we have rejected Lord Mansfield's rule denying the competency of the wife to testify to non-access by her husband, *Loudon v. Loudon*, 114 *N. J. Eq.* 242, 89 *A. L. R.* 904 (*E. & A.* 1933), although we adhere to the requirement that a strong showing is necessary to rebut the presumption of the legitimacy of a child conceived while the mother is married, *Cortese v. Cortese*, 10 *N. J. Super.* 152 (*App. Div.* 1950); *In re Rogers' Estate*, 30 *N. J. Super.* 479 (*App. Div.* 1954). But the authorities are in agreement that the barriers, to-day and historically, concerned the competency of the married person to testify as to non-access, or the standing, particularly of the mother, to maintain an action to question the

legitimacy of the offspring. No one has considered the barriers as based upon a conclusive presumption of the legitimacy of the child.

The earliest text writers and decisions recognized that this was the true nature of the obstacles put in the way of the married person attempting to dispute the husband's paternity of children conceived or born during the marriage. Illegitimacy could always be established by "proof of the impotency of the husband, of his being separated from his wife by sentence of divorce, or of his being so considerable a distance from her when she became pregnant, that it was *impossible* for him to have begotten the child." *Nicolas, Adulterine Bastardy,* 249 (1836). Blackstone in his *Commentaries* says:

"*Birth during wedlock.*—As bastards may be born before the coverture or marriage state is begun, or after it is determined, so also children born during wedlock may in some circumstances be bastards. As if the husband be out of the kingdom of England, or as the law somewhat loosely phrases it, *extra quatuor maria* (beyond the four seas), for above nine months, so that no access to his wife can be presumed, her issue during that period shall be bastards. But, generally, during the coverture, access of the husband shall be presumed, unless the contrary can be shown; which is such a negative as can only be proved by showing him to be elsewhere: for the general rule is, *praesumitur pro legitimatione* (the presumption is in favor of legitimacy). In a divorce *a mensa et thoro*, if the wife breeds children, they are bastards: for the law will presume the husband and wife conformable to the sentence of separation, unless access be proved; but in a voluntary separation by agreement, the law will suppose access, unless the negative be shewn. So also, if there is an apparent impossibility of procreation on the part of the husband, as if he be only eight years old, or the like, there the issue of the wife shall be bastards. Likewise, in case of divorce in the spiritual court, *a vinculo matrimonii*, all the issue born during coverture are bastards; because such divorce is always upon some cause, that rendered the marriage unlawful and null from the beginning." 1 *Blackstone, Commentaries,* *457–458 (1765).

The "four seas" rule, that "If a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity," Cardozo, J., *In re Findlay,* 253 *N. Y.* 1, 170 *N. E.* 471, 472 (*Cl. App.* 1930), so con-

trary to human experience, was ultimately exploded, see *In re Findlay, supra,* 170 *N. E.,* at *page* 473, 1 *Cooley's Blackstone* (*4th ed.* 1899), 403, *n.* 1, by the decision in *Pendrell v. Pendrell,* 2 *Stra.* 925, 93 *Eng. Rep.* 945 (*K. B.* 1732), where it was held that even though the husband were in England proof of non-access could be shown. The child was presumed to be legitimate if the mother was married, and a very heavy burden of proof was cast upon anyone asserting the contrary, but legitimacy could always be questioned. Lord Mansfield's *dictum* that a married woman was incompetent to testify to non-access by her husband, *Goodright v. Moss,* 2 *Cowp.* 591, 98 *Eng. Rep.* 1257 (*K. B.* 1777), was patently a rule of testimonial disability. The distinction between the presumption of legitimacy and the mother's lack of capacity to testify was recognized by Viscount Findlay in *Russell v. Russell* [1924] *A. C.* 687, 705–706 (*H. L.*), where he said,

"There is a strong presumption that the child of a married woman was begotten by her husband. This, however, is not a presumption *juris et de jure;* it may be rebutted by evidence. The fact that the wife had immoral relations with other men is not of itself sufficient to displace the presumption of legitimacy; non-access by the husband at the time when the child must have been begotten must (unless there be incapacity) further be proved. Proof of non-access cannot be given for this purpose either by the husband or by the wife; neither of them can be asked any question tending to prove such non-access; it must be established entirely by the evidence of other witnesses."

It has for centuries been, and is, the English rule that "The non-existence of access is a physical fact which may be proved by means of such legal evidence as is admissible in every other case in which it is necessary to prove a physical fact." 2 *Halsbury's Laws of England* (*2d ed.* 1931), 560–561; and see *The Poulett Peerage* [1903], *A. C.* 395, 398 (*H. L.*).

The different states vary as to the competency of the married person, particularly the mother, to rebut the presumption by giving testimony of non-access, see *Annotations,* 60 *A. L. R.* 380 (1929), 68 *A. L. R.* 421 (1930), 89 *A. L. R.* 911 (1934), and there is variation among the several states

with respect to the degree of proof required to overcome the presumption of legitimacy, see *Annotation*, 128 *A. L. R.* 713 (1940). Some deny the mother any standing at all to maintain an action to establish illegitimacy. But my research has disclosed no jurisdiction which makes the presumption of legitimacy absolute. Chief Justice Marshall recognized that we had carried the English rule into our jurisprudence, *Stegall v. Stegall, Fed. Cas. No.* 13,351, 2 *Brock.* 256 (*C. C. Va.* 1825), and the decisions of 38 jurisdictions reveal common recognition that legitimacy is merely a rebuttable presumption. *Lewis v. Crowell,* 210 *Ala.* 199, 97 *So.* 691 (*Sup. Ct.* 1923); *Jacobs v. Jacobs,* 146 *Ark.* 45, 225 *S. W.* 22 (*Sup. Ct.* 1920); *Murr v. Murr,* 87 *Cal. App.* 2d 511, 197 *P.* 2d 369 (*D. Ct. App.* 3 1948); *Peters v. District of Columbia,* 84 *A.* 2d 115 (*D. C. Mun. App.* 1951); *McLoud v. State,* 122 *Ga.* 393, 50 *S. E.* 145 (*Sup. Ct.* 1905); *Pursley v. Hisch,* 119 *Ind. App.* 232, 85 *N. E.* 2d 270 (*App. Ct.* 1949); *People v. Powers,* 340 *Ill. App.* 201, 91 *N. E.* 2d 637 (*App. Ct.* 1950); *Bowers v. Bailey,* 237 *Iowa* 295, 21 *N. W.* 2d 773 (*Sup. Ct.* 1946); *Bethany Hospital Co. v. Hale,* 64 *Kan.* 367, 67 *P.* 848 (*Sup. Ct.* 1902); *Copenhaver v. Hemphill,* 314 *Ky.* 356, 235 *S. W.* 2d 778 (*Ct. App.* 1951); *Evans v. Roberson,* 176 *La.* 280, 145 *So.* 539 (*Sup. Ct.* 1933); *Hubert v. Cloutier,* 135 *Me.* 230, 194 *A.* 303 (*Sup. Jud. Ct.* 1937); *Dayhoff v. State,* 206 *Md.* 25, 109 *A.* 2d 760 (*Ct. App.* 1954); *Commonwealth v. Kitchen,* 299 *Mass.* 7, 11 *N. E.* 2d 482 (*Sup. Jud. Ct.* 1937); *People v. Case,* 171 *Mich.* 282, 137 *N. W.* 55 (*Sup. Ct.* 1912); *State v. Soyka,* 181 *Minn.* 533, 233 *N. W.* 300 (*Sup. Ct.* 1930); *Boone v. State,* 211 *Miss.* 318, 51 *So.* 2d 473 (*Sup. Ct.* 1951); *Stripe v. Meffert,* 287 *Mo.* 366, 229 *S. W.* 762 (*Sup. Ct.* 1921); *In re Wray's Estate,* 93 *Mont.* 525, 19 *P.* 2d 1051 (*Sup. Ct.* 1933); *Craig v. Shea,* 102 *Neb.* 575, 168 *N. W.* 135 (*Sup. Ct.* 1918); *Groulx v. Groulx,* 98 *N. H.* 481, 103 *A.* 2d 188 (*Sup. Ct.* 1954); *Salas v. Olmos,* 47 *N. M.* 409, 143 *P.* 2d 871 (*Sup. Ct.* 1943); *In re Findlay,* 253 *N. Y.* 1, 170 *N. E.* 471 (*Ct. App.* 1930); *Ray v. Ray,* 219 *N. C.* 217, 13 *S. E.* 2d 224 (*Sup. Ct.* 1941); *State v. Coliton,* 73 *N. D.* 582, 17 *N. W.*

2d 546, 156 *A. L. R.* 1403 (*Sup. Ct.* 1945); *State ex rel. Sprungle v. Bard,* 98 *N. E.* 2d 63 (*Ohio App.* 1950); *Jackson v. Jackson,* 182 *Okl.* 74, 76 *P.* 2d 1062 (*Sup. Ct.* 1938); *In re Rowe's Estate,* 172 *Or.* 293, 141 *P.* 2d 832 (*Sup. Ct.* 1943); *Commonwealth v. Boyer,* 168 *Pa. Super.* 16, 76 *A.* 2d 230 (*Super. Ct.* 1950); *Barr's Next of Kin v. Cherokee, Inc.,* 220 *S. C.* 447, 68 *S. E.* 2d 440 (*Sup. Ct.* 1951); *Smith v. Smith,* 71 *S. D.* 305, 24 *N. W.* 2d 8 (*Sup. Ct.* 1946); *Jackson v. Thornton,* 133 *Tenn.* 36, 179 *S. W.* 384 (*Sup. Ct.* 1915); *Marckley v. Marckley,* 189 *S. W.* 2d 8 (*Tex. Civ. App.* 1945); *In re Jones' Estate,* 110 *Vt.* 438, 8 *A.* 2d 631, 128 *A. L. R.* 704 (*Sup. Ct.* 1939); *Scott v. Hillenberg,* 85 *Va.* 245, 7 *S. E.* 377 (*Sup. Ct. App.* 1888); *Carfa v. Albright,* 39 *Wash.* 2d 697, 237 *P.* 2d 795, 31 *A. L. R.* 2d 983 (*Sup. Ct.* 1951); *State v. Reed,* 107 *W. Va.* 563, 149 *S. E.* 669 (*Sup. Ct. App.* 1929); *In re Aronson,* 263 *Wis.* 604, 58 *N. W.* 2d 553 (*Sup. Ct.* 1953).

I do not read the Florida decisions as laying down a different rule. Indeed the Florida Supreme Court decision in *Eldridge v. Eldridge,* 153 *Fla.* 873, 16 *So.* 2d 163 (*Sup. Ct.* 1944), established that the Florida rule also is that the child conceived by a married mother is merely presumptively legitimate. It was there held that the husband may prove that the child is not in fact his. Florida does make it very difficult for the mother to question the legitimacy of her offspring. But despite the strong language in that regard quoted by my colleagues from *Ex parte Hayes,* 25 *Fla.* 279, 6 *So.* 64 (*Sup. Ct.* 1889), and *Gossett v. Ullendorff,* 114 *Fla.* 159, 154 *So.* 177 (*Sup. Ct.* 1934), the Florida rule refers to her competency to testify, or, to go the extreme limit, bars her any standing to maintain an action in the Florida courts. See *In re Madalina,* 174 *Cal.* 693, 164 *P.* 348, 1 *A. L. R.* 1629 (*Sup. Ct.* 1917), and *Annotation,* 1 *A. L. R.* 1632 (1919). *Ex parte Hayes, supra,* stands for no more in light of the citation with approval of 1 *Blackstone, Commentaries,* *454, which immediately precedes the excerpt from that work hereinabove quoted as stating the applicable English law. And I do not see that the Florida Divorce Act, *Fla.*

*Stat. Ann., sec.* 65.05, providing that a decree of divorce shall not render illegitimate the children born during the marriage, bears on the question whether Florida law makes the presumption absolute or merely rebuttable. That statute simply provides that, of itself, a decree of divorce does not make illegitimate any children born during coverture.

Thus, Florida, like every other jurisdiction the law of which I can discover, allows proof of non-access of the husband to prove illegitimacy, and the only questions are whether the mother is a competent witness to the fact or is permitted a standing to maintain an action for the purpose. But those matters are governed by the law of the forum, *Restatement, Conflict of Laws, sec.* 588, *p.* 705, *sec.* 596, *p.* 713 (1934), and in New Jersey the mother is a competent witness and is permitted to maintain an action. The majority conclusion can be sound only if the full faith and credit clause of the Federal Constitution compels New Jersey to apply to this plaintiff the disabilities of the Florida law and to deny her a standing in our courts merely because the courts of Florida would not hear her if she and the children still resided there and she brought a like action in that state. Granted, as the majority says, it is "the sense and significance" of the Florida statute to deny her an action in the Florida courts. But plaintiff's second count seeks to enforce a support obligation under the New Jersey statute and not under any Florida statute. Our statute establishes an obligation of the father at the suit of the mother where none existed at common law. *Borawick v. Barba,* 7 *N. J.* 393, 400 (1951). At best the Florida statutes may be viewed as a defense to the action on the New Jersey statute and "where a foreign statute has been set up as a defense to   *   *   * proceedings under a local statute, the conflict is to be resolved, not by giving automatic effect to the full faith and credit clause and thus compelling courts of each State to subordinate its own statutes to those of others, but by appraising the governmental interest of each jurisdiction and deciding accordingly." *Corwin, Constitution of the United States,* 676 (1953).

This principle was reaffirmed by the United States Supreme Court in a decision handed down but a few days ago, on June 6, 1955, *Carroll v. Lanza*, 75 *S. Ct.* 804, 99 *L. Ed.* ——. There a Missouri employee was injured in Arkansas. By statute in Missouri workmen's compensation is the exclusive remedy of an employee of a subcontractor injured by the negligence of a prime contractor. Arkansas, on the other hand, allows a common law action against the prime contractor. The Supreme Court held that since Arkansas, the *situs* of the tort, had an interest in the consequences of the injury, it need not, under the full faith and credit clause, apply the Missouri law to deny the employee a recovery in its courts under its law. Mr. Justice Douglas, writing the majority opinion, noted that the full faith and credit clause does not make one state the "vassal" of the others, and that as to Arkansas,

"* * * Her interests are large and considerable and are to be weighed not only in the light of the facts of this case but by the kind of situation presented. For we write not only for this case and this day alone, but for this type of case. The State where the tort occurs certainly has a concern in the problems following in the wake of the injury. The problems of medical care and of possible dependents are among these, as *Pacific Employers Insurance Co. v. Industrial Accident Commission* [306 *U. S.* 493, 59 *S. Ct.* 629, 83 *L. Ed.* 940] emphasizes. *Id.* 306 *U. S.* 501, 59 *S. Ct.* 632. A State that legislates concerning them is exercising traditional powers of sovereignty. *Cf. Watson v. Employers Liability Corp.*, 348 *U. S.* 66, 73, 75 *S. Ct.* 166. Arkansas therefore has a legitimate interest in opening her courts to suits of this nature, even though in this case Carroll's injury may have cast no burden on her or on her institutions." 75 *S. Ct.* 807, 99 *L. Ed.* ——.

Similarly, can it be questioned but that New Jersey "certainly has a concern in the problems" of these children? If the mother cannot support and educate them, is the father to escape who by our statute is obliged to do so, and is the burden of their support then to be shifted to the public treasury? Our statute, *N. J. S. A.* 9:16–2, evinces a strong public policy that every father shall support his illegitimate children, even when born of his adultery with a married

woman. To apply Florida law which the Federal Constitution does not oblige us to apply subverts that policy when the parents and the children are residents of this state. While the Legislature could doubtless engraft that qualification upon the statute, it has not done so. I deem it to be outside the province of this court to put limitations upon the scope of a statute not compelled by applicable constitutional restrictions.

Mr. Justice WACHENFELD and Mr. Justice JACOBS join in this dissent.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For reversal in part*—Justices WACHENFELD, JACOBS and BRENNAN—3.