PRUDENCIO PÉREZ NIEVES, Petitioner, v. SUPERIOR COURT OF PUERTO RICO, CAGUAS PART, J. VILLARES RODRÍGUEZ, JUDGE, Respondent.

No. 2253. Resubmitted July 9, 1958.—Decided June 8, 1960.

*J. E. González Quiñones* and *Modesto Vázquez Suárez* for petitioner. *Hiram R. Cancio, Secretary of Justice,* (*José Trías Monge, former Secretary of Justice,* on the brief) and *Rafael L. Ydrach Yordán* and *Augusto A. Saavedra Blasco, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for respondent.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Petitioner Prudencio Pérez Nieves was convicted in the District Court, Caguas Part, of a violation of § 263 of the Penal Code (1937 ed.) for failure to provide support without just cause to a child four months old named Rosario Díaz. Under the provisions of Act No. 108 of April 30, 1940, Hipólita Díaz went to said court and stated under oath that she had had marital relations with Pérez Nieves, from which a girl was born and that Pérez Nieves had failed to furnish support. Pursuant to Act No. 108 petitioner was summoned to appear before the district judge, where he denied being the father of the child. The judge then ordered that the ordinary proceedings for abandonment and neglect of minors be followed. The complaint was filed on June 14, 1955.

The statement of the case submitted by the district judge contains the following summary of the evidence: The complainant testified that she has had relations since 1954 with the defendant Prudencio Pérez Nieves, and in the month of May of that year she became pregnant and was delivered of child on January 26, 1955; that the defendant sent her five dollars for the midwife and gave her two dollars weekly for the milk of the child and at other times sent it from his grocery; that the child became ill and the defendant gave her three dollars to take her to the doctor and also bought some medicines for her. He had helped her until August* 11, 1955, but thereafter did not provide any more support. She

---

* It so appears in the original. It is probably an error of transcription since the complaint was filed June 14, and the hearing was held on August 4, 1955.

testified that she had married Miguel Angel Rivera on November 9, 1953, but had not lived with her husband and that she had lived with the defendant since January 1954. María Luisa Dones testified that she was the foster mother of the complainant; that the child was born at her house and the defendant gave her five dollars for the midwife. Later he sent milk weekly. That she had asked him to register the child but he had refused, and that her daughter had told her that the child was his. The midwife testified that she attended Hipólita Díaz at childbirth, receiving five dollars for her services and that she was not interested in learning who the father was. A witness for the defense stated that the complainant was married to Miguel Angel Rivera and that he saw her with her husband at a bar, and that the witness believed, without being sure, that she was pregnant. Another witness who knew Hipólita Díaz at defendant's bar, saw her there with her husband Miguel Angel Rivera and saw them together again at Puerto Nuevo in July and August 1954. A third witness testified in like terms. The defendant stated that he had met the complainant five years ago, that he knew she was married to Miguel Angel Rivera and saw her with her husband at his business place; that he had had intimate relations with her once or twice and that she informed him that she was pregnant. He did not learn until three months later that she had given birth to a child. The marriage certificate of the complainant and Miguel Angel Rivera was introduced in evidence showing that they contracted marriage on November 7, 1953.

The defense raised the question of law that since the complainant was married the presumption of law was that her child was reputed to be from her marriage, and that the district court had no jurisdiction because the question involved in this case was the challenge of paternity. The district court rendered judgment of conviction and based its reasonings on Act No. 229 of 1942 and on the ruling laid down by this Court in *Agosto* v. *Javierre*, 77 P.R.R. 444. Feeling

aggrieved by this judgment of conviction the petitioner appealed to the Caguas Superior Court and assigned as error lack of jurisdiction as well as that the judgment was contrary to the evidence and did not conform to the applicable law. He based the second error on the fact that nonaccess of the husband during the first 120 days of the 300 days that preceded the birth of the child had not been established as required by § 113 of the Civil Code. The Superior Court affirmed the judgment on the ground that the appeal was entirely frivolous.

We issued the certiorari to review this judgment. Because of the peculiar circumstances under which the decision in *Agosto* v. *Javierre* [1] was rendered, and considering also that the birth in this case took place subsequent to the constitutional declaration prohibiting discrimination by reason of birth—for the juridical effect, if any, of said prohibition on §113 of the Civil Code (1930 ed.)—it is of strict necessity, to a certain extent, to review the jurisprudential antecedents of the question now before us in order to clearly establish the applicable doctrine in situations such as the present case.

■ In *People* v. *Ferrán*, 26 P.R.R. 230 (1918), we were confronted for the first time with the question of children begotten out of wedlock, for the purposes of § 263 of the Penal Code. This section provided at that time that every father or mother of a child who voluntarily and without legal excuse

---

[1] The Court was divided 4 to 3. The present Chief Justice, Mr. Negrón Fernández, concurring in a separate opinion in this case, constituting the majority vote which reversed the judgment and remanded the case, stated as follows: "That is why, in concurring in the reversal of the judgment appealed from and signifying my conformity with the doctrine laid down in Mr. Justice Ortiz's opinion and which recognizes the minor's right to bring an action of filiation seeking his true father, notwithstanding his status of legitimate child under the Civil Code—by virtue and operation of Act No. 229—I do so with reservation as to some particulars which in my judgment were unnecessarily discussed in that opinion and I signify my disagreement as to others, particularly the need for amending the complaint, since in my opinion and according to my views in *Figueroa* v. *Díaz, supra,* the said complaint sets forth a cause of action of filiation which requires no amendment."

failed to comply with any of the obligations imposed upon them by law, of furnishing the indispensable food, clothing, or medical assistance, would be guilty of a misdemeanor. Construing this section in the sense that it only embraced the parents of legitimate children, and in that case they were extramarital children, we reversed the judgment that convicted the father for abandonment. That was the situation until 1931, when § 263 was amended by Act No. 35 of April 24 of that year, as it stands today, making the father or mother of a legitimate, legitimized, acknowledged natural or illegitimate and adopted child criminally responsible for abandonment.[2]

The first case that was decided after the amendment and which involved an illegitimate child was *People* v. *Rohena*, 52 P.R.R. 301 (1957). The defendant denied at the trial that he was the minor's father and, upon being convicted, alleged as error that the court had declared him the natural father without it having been established by judgment of filiation prior to the prosecution under § 263 that there existed the parent-child relationship and without the filiation having been acknowledged by indubitable document. Rejecting this argument we said that the fact of paternity, that is, the parent-child relationship between the defendant and the minor, could be properly established within that criminal prosecution.

In *People* v. *López*, 54 P.R.R. 279 (1939), we treated the 1931 amendment to § 263 with a more cautious step in the light of the problem of illegitimate filiation, which case involved adulterine children in the concept that said children had in the legislation prior to Act No. 229 of May 12, 1942. 31 L.P.R.A. § 501. We did not accept defendant's contention to the effect that he could not be convicted of abandonment, in the case of adulterine children, in the absence of a final judgment rendered in a civil or criminal action, from which his

---

[2] Section 263 of the Penal Code (1937 ed.) 33 L.P.R.A. § 991.

paternity could be inferred, or in the absence of an indubitable document where filiation was expressly acknowledged, as provided by §§ 128 and 129 of the Civil Code;[3] nor did we accept the contention that the proof of paternity should be a fact prior and pre-existing to the claim for support. Construing this amendment, Mr. Chief Justice Del Toro said:

"Illegitimate children are divided into two classes, to wit: children born out of wedlock, from parents who, at the moment when such children were conceived, could have intermarried, and children born out of wedlock, from parents who, at the time they were conceived, could not have intermarried. The former are called natural children and it is in their behalf that the law created an action for their acknowledgment. Sections 125, 126 and 127 of the Civil Code, 1930 ed. In behalf of the latter no such action exists. The civil law only acknowledges them the right—section 128 of the Code—to such support from the parents as is prescribed in section 143.

"There is no doubt that the word acknowledged as used by the legislator in regard to illegitimate children in criminal law— section 263 of the Penal Code, 1937 ed.—did so unwittingly. But starting from the basis that they do exist, we believe that it means that the crime is only committed where a father, who is in a position to do so, fails to support his illegitimate issue whom he has held as such children publicly or privately, or because being his issue, he would have been bound to acknowledge them should they have been natural children. Thus, reasonably construing the provisions of the Civil Code—section 129—in harmony with the amendment introduced by the Legislative Assembly to the penal law in 1931 (Act No. 35* of 1931, page 352),

---

[3] Section 128 of the Civil Code (1930 ed.), 31 L.P.R.A. § 507.

"The illegitimate children lacking the lawful qualification of natural children are only entitled to such support from their parents, as is prescribed in section 143."

Section 129 of the Civil Code (1930 ed.), 31 L.P.R.A. § 508.

"The right to the support mentioned in the preceding section can only be exercised:

"1. Where the paternity or maternity is inferred from a final judgment rendered in a criminal or civil action.

"2. Where the paternity or maternity is shown by an indubitable document from the father or mother wherein the filiation is expressly recognized."

* Original text incorrectly reads "36".

we are of the opinion that the criminal proceeding therein referred to can be the one rendered within the criminal action prosecuted for abandonment of minors as in the instant case.

"      .      .      .      .      .      .      .

"Within our present state of the law, the judgment rendered in a criminal prosecution of which said section speaks, can be no other than the one rendered in the criminal action for abandonment of minors where all the essential facts can be duly established. The duty of the father arises from the material fact that he is the father. Once it has been duly proved that he is the father, and that so being he failed to discharge his duties in the manner established by the criminal law, the crime should be understood to have been committed."

The legal responsibility of the father under § 263 to support the illegitimate child, whether or not the latter could demand his acknowledgment under the existing law at that time, was based only on the natural filiation, on the fact of being his child, the relation itself between generator and generated, without taking into account those other rules of family law which led to the juridical filiation based on acts of acknowledgment or on the conduct and behavior of the parents. As a logic sequel it was firmly established that that natural relation between procreators and procreated—the paternity—was open to judicial investigation, and that it could be determined in the same proceeding under § 263.[4]

The *López* case had a more ample significance since its doctrine was enhanced in *Rivera* v. *Cardona*, 56 P.R.R. 786 (1940), to embrace a civil action for support filed for the first time—it could be logically assumed that it was inspired in

---

[4] See: *People* v. *Rotger*, 55 P.R.R. 133 (1939); *People* v. *Pérez*, 55 P.R.R. 655 (1939); *People* v. *Saldaña*, 55 P.R.R. 885 (1940); *People* v. *De Jesús*, 57 P.R.R. 694 (1940); *People* v. *Calzada*, 58 P.R.R. 512 (1941); *People* v. *Emanuelli*, 61 P.R.R. 202 (1942); *People* v. *Bernabe*, 63 P.R.R. 385 (1944); *People* v. *Cáceres*, 65 P.R.R. 344 (1945); *People* v. *Avilés*, 66 P.R.R. 278 (1946); *People* v. *Santiago*, 67 P.R.R. 80 (1947); *People* v. *Rodríguez*, 67 P.R.R. 688 (1947); *People* v. *Méndez*, 67 P.R.R. 772 (1947); *People* v. *Ortiz*, 67 P.R.R. 848 (1947); *People* v. *Mercado*, 69 P.R.R. 310 (1948); *People* v. *Suárez*, 70 P.R.R. 435 (1949); *García* v. *Acevedo*, 78 P.R.R. 580 (1955).

that decision and in the *Rohena* case—by an illegitimate child who at that time did not have the status of natural child, and who had been unable to file an action of filiation. The problem that now arose, which was novel in our jurisdiction, was whether an illegitimate child could file a civil action for support against his presumptive father without the paternity having been previously established by final judgment in a civil or criminal suit or by indubitable documents where filiation was expressly acknowledged, as required by §§ 128 and 129 of the Civil Code. Following the reasoning of the *López* case, this Court, speaking through Mr. Justice De Jesús, said that the right to support is so intimately related with the *determination of the paternity* that we saw no reason why the whole controversy could not be decided in a single proceeding whether it be directed to the *declaration of the paternity* and as an incident thereto the claim for support, or whether it dealt, as in that case, with a claim for support *where the paternity was incidentally established*. Similarly to the prosecutions under § 263 of the Penal Code, the right of illegitimate children to receive support under the civil law rested on the sole fact of the procreation to be proved in the same proceeding, without taking into account, for granting the support, other considerations with respect to filiation, nor the right to be acknowledged, and even if the latter failed or was improper.[5]

Up to the *Cardona* case and in practically all the other cases that followed, our civil and criminal decisions with respect to the support of the unacknowledged illegitimate off-

---

[5] *Falcón* v. *Cruz*, 67 P.R.R. 496 (1947); *Rosario* v. *Suárez*, 67 P.R.R. 552 (1947); *People* v. *Rodríguez*, 67 P.R.R. 688 (1947); *People* v. *López*, 67 P.R.R. 732 (1947); *Cerra* v. *District Court*, 67 P.R.R. 872 (1947); *Rodríguez* v. *Cruz*, 68 P.R.R. 696 (1948); *Vargas* v. *Jusino*, 71 P.R.R. 362 (1950); *Molini* v. *District Court*, 72 P.R.R. 884 (1951); *cf. Armáiz* v. *Santamaría*, 75 P.R.R. 544 (1953). See Act No. 108 of 1940 and the following cases construing it: *People* v. *Lamboy*, 59 P.R.R. 173 (1941); *People* v. *Emanuelli*, 61 P.R.R. 202 (1942); *People* v. *Ramos*, 61 P.R.R. 372 (1943); *Rosario* v. *Suárez*, 67 P.R.R. 552 (1947); *People* v. *Méndez*, 67 P.R.R. 772 (on reconsideration) (1947); *Maldonado* v. *Warden*, 73 P.R.R. 199 (1952).

spring all had to deal either with natural children of unmarried father and mother at the time of their conception or with adulterine children begotten by a married man with an *unmarried woman*. In *People* v. *Santiago*, 70 P.R.R. 798, decided in 1950, we were confronted for the first time, as we are here again, with a case of support for an alleged adulterine child had by a *married woman*, born in 1941 following 180 days after the marriage of the mother and before the 300 days following its dissolution by divorce. The presumptive natural father was convicted of abandonment of said minor and irrespective of the evidence adduced which tended to establish that the defendant was the father, we relieved him from criminal responsibility pursuant to the provisions of §§ 113 and 116 of the Civil Code.[6] This time, speaking again through Mr. Justice De Jesús, we said:

"... But apart from this, since we are dealing with a criminal case, the presumption of legitimacy can not be challenged within this proceeding. In this respect § 116 of the Civil Code provides that the legitimacy can only be challenged by the husband or his legitimate heirs. In enumerating those who may challenge the legitimacy, the Code, naturally, excluded those that it did not mention in said Section. If it would have been the intention of the Legislature to vest the State with power to challenge the legitimacy, it could have easily done so. *Ex parte Madalina,* 164 Pac. 348 (Cal. 1917).

---

[6] *Section 113 of the Civil Code* (1930 ed.) 31 L.P.R.A. § 461.

"Legitimate children are those born 180 days after the marriage has been celebrated and before 300 days have passed after the marriage has been dissolved.

"Against legitimacy no other proof shall be admitted than the physical impossibility of the husband to use his wife within the first one hundred and twenty days of the three hundred days that have preceded the birth of the child."

*Section 116 of the Civil Code* (1930 ed.) 31 L.P.R.A. § 464.

"Legitimacy can only be disputed by the husband or his legitimate heirs. The latter can only contest the legitimacy of a child in the following cases: ...."

"It may be argued that the limitation as to who may challenge the legitimacy is within the purview of the Civil Code, and since no similar provision is contained in the Penal Code, § 116 is not applicable to criminal actions. This argument is untenable because § 116 establishes the public policy of the State in relation to contesting the legitimacy and, naturally, this policy should not vary with the nature of the proceeding brought."

The same ruling of law was later applied in *Pérez* v. *Rosario*, 72 P.R.R. 480 (1951), in a similar situation involving a civil suit for support. Distinguishing the former decisions we affirmed the judgment which dismissed the complaint saying: ". . . Here the paternity of the child is established by law —§ 113 of the Civil Code, *supra*—as a legitimate daughter of appellant's husband . . . ."

Such was the state of our case law which would permit us to dispose of this case without further consideration of the problem. But in 1954 we decided the case of *Agosto* v. *Javierre*, in which in an opinion of 3 of the 7 judges then present the *Santiago* case was overruled together with *Pérez* v. *Rosario*. This makes it imperative, before continuing the discussion of the matter before us, to enter into certain considerations as to which was actually the effect of the *Javierre* case, in the light of its own pronouncements, as to the manner in which we disposed of the *Santiago* case. *Agosto* v. *Javierre* originated as a civil claim for support only, under circumstances similar to those of the *Pérez* v. *Rosario* case. Since the minor involved in the *Rosario* case was born in 1950, and it being likewise a civil action, it is apparent that this decision was in conflict with the treatment thereafter given by the majority of the Court to the same situation in the *Javierre* case. That was not exactly the situation in the *Santiago* case where, it being a criminal prosecution, the action for support would have never become by itself a *filiatory action* and where there was no problem of "judicial acknowledg-

ment." (See footnote 1.)[7] Taking the overruling of the *Santiago* case as a pronouncement of the majority, the disposal of the problem now before us which we made in that case was not disregarded or in any other way altered by our ruling in the *Javierre* case, as is shown by the very statements of Mr. Justice Ortiz in his opinion. In order that the action of filiation recognized by Act No. 229 of 1942 to all illegitimate children could obtain significance and efficacy, the majority of this Court reached the conclusion that said Act had impliedly amended § 116 of the Civil Code so as to allow also the child to attack the legitimate paternity in search of the acknowledgment by his true father. In that opinion (77 P.R.R. at 468), it is said that *in this type of cases* [of an adulterine child formerly and at that time natural, but born of a married mother] the dominant action must be filiation and the claim for support must be considered as incidental to the action of filiation because, in order that a claim for support against the putative true father, other than the husband's mother, may be successful it would be necessary to establish the paternity, that is, the parent-child relationship, which necessarily entailed an attack on the paternity of the husband, the destruction of the existing status of legitimacy being a necessary effect of the success attained in the claim for support. It was further stated that it would be unreasonable to uphold the right of support against defendant therein on the ground that the latter was plaintiff's father, and at the same time maintain plaintiff's status as legitimate son of the mother's husband. And that if the controversy were consigned to the right to support, the plaintiff would be losing his status of legitimacy without establishing a new filiation. The basic proposition involved should be, it is added in the

---

[7] Mr. Justice Negrón Fernández, then Associate Justice, expressed his agreement with the doctrine of the aforesaid opinion which recognized the right of the minor *to file an action of filiation* to seek his true father [for which purpose the right of the minor to attack his legitimate paternity was being recognized] but with reservation as to some of the other particulars of said opinion.

*Javierre* case, that of the minor's filiatory relation and the identification of his true father, and the right to support would then flow from the filiation, which should be previously established. In the light of the foregoing considerations it was the opinion of this Court that the matter should be remanded to the lower court so that the case which had originated as an action for support be transacted as an action of filiation, for the purpose of preventing that the minor's legal status remain in a vacuum. It will be noted that nothing previously said is in conflict with the disposal itself of the problem before us as made by this Court in the *Santiago* case. But there is still more. More relevant to the present case the opinion in the *Javierre* case reads: ". . . As a sequel to the foregoing norms, it is well to indicate, collaterally, that in cases such as this one, a criminal action of abandonment or for support should not be prosecuted, unless claimant's true filiation is established in a proper civil proceeding."

The decision of the *Javierre* case does not project juridically beyond its own context with respect to Act No. 229 of 1942. In deciding that this statute must have impliedly modified § 116 of the Civil Code so as to meet the purposes of that legislation, the standards of our law which historically and by reason of its superior social interest have safeguarded the integrity of the family in our culture, were not destroyed. Considering § 116 in the light of Act No. 229 of 1942, the power to attack the legitimate paternity was extended only to the child itself, where the latter would seek to establish his true filiation, as a means necessarily incidental to an acknowledgment which, under Act No. 229, he was already entitled to establish judicially. The power to attack was not extended to the mother even when she acted in representation and on behalf of the son, nor was it recognized to any other person or entity. On the other hand, we followed the rule laid down in *Chabrán* v. *Méndez*, 74 P.R.R. 719, in the expectation of a possible conflict of interest between the mother and the child. It flows from the foregoing that the legal ground on which the

decision in *People* v. *Santiago* was based still survives, not only because the legislation has not been altered, but also by virtue of the very pronouncements of the *Javierre* case, and because of the fact that that criminal proceeding instituted by the state did not involve any problem as to the right of the very minor to attack his paternity pursuant to law as a means to obtain an acknowledgment permitted by the Act of 1942 and which was what this Court held to be fundamentally controlling in the *Javierre* case, relegating to a secondary plane the question of support as incidental to the filiation action. *Agosto* v. *Javierre* does not have the juridical effect ascribed to it by the judges of the lower court who entertained this case, nor does it project, as we previously said, beyond its own ambit, and, notwithstanding the overruling pronouncement contained therein, it did not divest of its reason of law the doctrine laid down in *People* v. *Santiago*. Finally, any doubt on this particular should have been dispelled in *Pérez* v. *Torres*, 79 P.R.R. 575, decided shortly thereafter in 1956, where the limited scope of the amendment made to § 116 clearly stands out. Even under the extreme circumstances that arise from the facts of this latter case, we did not allow a natural father to challenge the legitimate paternity in his endeavor to establish his status as the true father of the child had by him with a married woman.[8] Having made plain the situation in the *Javierre* case, it is convenient to note that the doctrine of *People* v. *Santiago* has been applied and followed by American courts in analogous situations. In *In re Mada-*

---

[8] In this case the child was registered as the legitimate daughter of the mother and her husband. The natural father requested the annulment of the birth certificate and that she be recorded as his own natural child. He sued the daughter, the mother, and the husband, alleging that the child had been begotten while he lived in public concubinage with the married mother of the child, that he had held the child as having continuous possession of the status of natural daughter, and that he had attended her and supported her the same as his own legitimate children. The *husband* defendant appeared by counterclaim reproducing the same averments as well as the prayer to which the plaintiff acquiesced. Notwithstanding these circumstances we denied the cause of action of the natural father applying §§ 113 and 116.

*lina,* 174 Cal. 693, 164 Pac. 348 (1917), cited by Mr. Justice De Jesús, the Supreme Court of California (in bank), considering §§ 193, 195 and 196 (*a*) of the Civil Code of said state,⁹ discharged the prisoner on habeas corpus and released him from criminal prosecution for the abandonment of an illegitimate child had with a married woman, who was accused of violation of § 270 of the Penal Code, equivalent to our § 263, as amended shortly before in 1915, so as to include in its provisions illegitimate offspring. It was stipulated that in the preliminary examination the mother had testified to the nonaccess of her husband or of any other person other than the defendant for a period of 2 years next prior to the birth of the child. Notwithstanding the fact that the California court recognized to *the mother* the right to attack the legitimacy of the child, and also to the *child* itself as her descendant, its Supreme Court stated the following:

"We are satisfied that the position of counsel for petitioner is correct, and that any claim to the contrary is answered by a consideration simply of section 195 of the Civil Code, which declares that the presumption of the legitimacy of a child born in wedlock can only be raised by the husband or wife or the descendants of one of them. This is the declared policy of this state, and is simply the adoption of a rule prevailing generally in all civilized communities. . . . Counsel for respondent strenuously contends that section 195 of the Civil Code is inapplicable, because the criminal proceeding under section 270 is found in the Penal Code which as to all criminal procedure governs. But this contention is not sound. *A mere place in the codes is not decisive of the effect or the application of code provisions. The Civil Code by section 195 was laying down a rule of public policy in a matter which the state deemed vital to*

---

⁹ Section 193 provides that all children born in wedlock shall be presumed legitimate. Section 195, prior to its amendment in 1955, provided that said presumption of legitimacy could only be challenged by the husband or *wife* or descendants of one or both of them. Section 196 (*a*) imposes on the parents of an illegitimate child the duty to support him and permits the mother to file a civil action against the father on behalf of said child to enforce said obligation.

*society; it was following the civilized rule and made it applicable under all circumstances where the question of legitimacy of children born in wedlock was sought to be raised,* prescribing a limitation as to the persons who might raise the question by expressly enumerating those who might do so . . . . (Italics supplied.) When it came to providing for proceedings under section 270 the legislature did not in any language found therein, or anywhere else, abrogate what it had laid down in section 195 as to questioning the legitimacy of a child born in wedlock. This section 195 is to be considered with section 270 as *in pari materia* with the latter and must be construed as a part of it . . . .

"But it is said by counsel for respondent that authority to raise the question of legitimacy where the child is born in wedlock must be implied from the enactment of section 270 authorizing the criminal proceeding; that such a proceeding can only be brought in the name of the state. True, the criminal proceeding must be in the name of the state—the people—and is authorized to punish the parent of an illegitimate or legitimate child for an omission without excuse to support it. . . . But when it is attempted to bring within its terms in a criminal prosecution a question of the legitimacy of children born in wedlock there is nothing directly or inferentially in the language of section 270 which authorizes the state to raise that question. To the contrary, the expressly declared policy of the state as found in section 195 precludes it from doing so, and in the interests of public policy, decency, morality, and the protection of innocent children this commends itself . . . ."

In our search of American decisions we have found that the preceding pronouncements have been frequently adopted as their own and followed by other state courts of appellate jurisdiction as the generally accepted rule.[10]

---

[10] See: Annotation in 1 A.L.R. 1632 (1917) and the Supp. Annotation in 53 A.L.R.2d 572 (1955). See also: *State* v. *Coliton*, 17 N.W.2d 546 (1945); *State* v. *Reed*, 149 S.E. 669 (1929); *State* v. *Fury*, 205 N.W. 877 (1925); *Commissioner of Public Welfare* v. *Koehler*, 30 N.E.2d 587 (1940); *State* v. *Randall*, 53 So.2d 689 (1951); *State* v. *Lemoine*, 69 So.2d 15 (1953); *State* v. *Jones*, 56 So.2d 724 (1951); *Jenkins* v. *Aetna Casualty & Surety Co.*, 158 So. 217 (1935); *In re Findlay*, 170 N.E. 471 (1930); *González* v. *Pacific Greyhound Lines*, 209 P.2d 598 (1949); *Serway* v. *Galentine*, 170 P.2d 32 (1946); *In re Tinkers Estate*, 215 Pac. 779 (1923); *Miller* v. *Tyndall*, 212 Pac. 989 (1923); *Graham* v. *Lee*, 37 So.2d 735 (1948); *County of Santa Clara* v. *Doll*, 337 P.2d 582 (1959); *Kowalski* v. *Wojtkowski*, 116

In reaffirming once more those principles we must point out that our ruling in *People* v. *Santiago* has, besides, another reason of being at law. Historically considered, it is somewhat uncertain and dubious whether, absent a legislative pronouncement which would tend to show otherwise, the amendment made to § 263 of the Penal Code in 1931 and the subsequent enactment of Act No. 108 of 1940 may be viewed as considering within the concept of "illegitimate" and as including a child which, according to the existing legislation which it can not be presumed the legislator ignored, did not fall under said classification because it enjoyed a legitimate paternity acknowledged by law from its birth and by reason thereof. Particularly, if one bears in mind that differently from other states where legislation has been enacted to authorize in specific cases the recovery of support under penal sanction, in situations similar to the present one, our Legislature has not permitted such thing against a presumptive father who is not and was not the husband, not even when it adopted a special statute for illegitimate children such as Act No. 108. But apart from any doubt as to whether said children were included or not in the criminal

---

A.2d 6 (1955). These cases, among others, offer an elaborate discussion on the rules that govern Anglo-American jurisdictions concerning the challenge of the legitimate paternity of the children, as the same have developed from the historical point of view of the common law (Lord Mansfield Rule) through the positive legislation adopted on this point by the different states. As particularly illustrating these rules we have the opinions in the case of *Kowalski* v. *Wojtkowski, supra*, where the Supreme Court of New Jersey held that, under its own proceedings, a mother domiciled in New Jersey could not recover support from a presumptive natural father, also domiciled therein, for children born in Florida while she was married to another person, under the doctrine that in Florida, where the children were born, the mother was not permitted to attack the legitimate paternity of said children. The presumption that children born in wedlock are legitimate is of general application in the states. The decisions show different views rather as to how and who can destroy said presumption pursuant to the public policy of each state according to its own legislation. However, we have found no authority maintaining that the general legislation of the state on this point, because of the mere fact of its civil nature, is not equally applicable in criminal cases or in any other proceeding for a particular relief in which the question is raised.

statute while they asserted a legitimate paternity, the criminal responsibility imposed by law under § 263 depends also, as does the legitimate paternity, on the fact that the child was begotten by the one who is deemed to be the father.[11]

It is evident, as revealed by several of the cases cited, that *as a question of law* no criminal responsibility may be cast on a person other than the father recognized by law and who has the duty to give support, while this paternity subsists and has not disappeared, unless it is legally challenged or destroyed by the judgment rendered in the proper criminal proceeding, which is impossible herein under our state of legislation.[12]

---

[11] Section 108 of the Spanish Civil Code provides that children born within a specific period fixed therein *shall be presumed* legitimate. Our Code, following closer the Roman law maxim *"pater est is quem nuptiæ demonstrant,"* declares in its equivalent § 113 that the children *are* legitimate, although like the Spanish Civil Code, it permits certain evidence of exclusive character against the fact declared. The scientific reason for § 113 arises from the *viability* of the child born based on the doctrine of Hypochrates, followed by doctor Fourcroy in drawing up the Code Napoleon and in other legislations, to which doctrine Manresa refers thus: (*Comentarios al Código Civil Español*, Vol. 1, p. 643, 7th ed.) "The reasoning of the lawmaker has been consonant with the Roman texts (Ulpiano, Digest, 3rd law, tit. 16, bk. 38), which copy from the *Partidas* thus: 'Hypochrates was a philosopher in the science of physic, who said that the greatest length of time a woman can carry a child in her womb, is ten months . . . . That philosopher also said, that a child born after seven months, provided its birth was one day only after the seventh month began, and it be perfect and capable of living'; therefore, in either case it could have been, naturally, begotten by the husband." See: Puig Peña, *Tratado de Derecho Civil Español*, Tome II, Vol. II, pp. 15–32; Judgment of the Supreme Court of Spain of January 24, 1947 and others reviewed by Medina & Marañón, *Leyes Civiles de España*, pursuant to §§ 108 *et seq.* of the Civil Code; Manresa, *op. cit.* pp. 649–657.

In view of the fact that the petitioner raises a second question of fact to the effect that the evidence introduced did not show the physical impossibility of the husband to have carnal access to the complainant, we should make clear that we are not considering said question nor anticipating judgment as to the application to criminal claims of the second paragraph of § 113 with respect to the nature and the exclusiveness of the evidence permissible to attack the legitimacy, or to any other civil action instituted by the child in which the challenge is involved.

[12] Thirty-eight years after the prevalence of the ruling in the *Madalina* case, *supra*, California, in 1955, met the situation by amending § 195 of the Civil Code. It provided that the presumption of legitimacy can be disputed

The preceding conclusion is not at variance with our earlier cases which involved children of unmarried mothers lacking in law a father who could be made criminally responsible under § 263. We permitted proof of who the father was. It is in the light of that situation of fact and of law that the pronouncement of those cases should be construed.

This decision does not prejudge in one sense or another the question of the paternity of the minor. Unquestionably, the child is entitled to bring a civil action for the declaration of paternity and support against petitioner herein and to establish that he is her father, even if it entails the challenge of the paternity by law. (*Agosto* v. *Javierre*, except that in view of the fact that the birth took place after the effectiveness of the Constitution, the child is not bound to bring an action of filiation under § 125). Not until the existing legislation is amended, the action to be followed should permit the child pursuant to law to change from a filiatory status to another with the proper adjudication of the rights of all the parties affected, including any conflict of interest between the minor and its own mother since, as a consequence of the child's claim he shall cease to belong to a family with all the rights inherent to him therein in order to become a member of another family with other rights or none of them.

◼ As we have seen, this child was born after the effectiveness of the constitutional provision which prohibits discrimination by reason of birth. We must point out that § 113 of the Civil Code was not rendered void, *ipso jure*, by said constitutional provision. If such were the case the judgment on review should be affirmed without more as a question of law, provided the facts are supported by the evidence. Section 113 does not establish by itself any discrimination and its reference to *"legitimate children"* does not create for those born after July 25, 1952, any difference amid the children of

only "by the people of the State of California in a criminal action brought under the provisions of Section 270 of the Penal Code," or by the husband, etc. (Amendment in quotes.)

the same father, in view of the provisions of Act No. 17 of August 20, 1952, which provides that all children shall have with respect to their parents and to the property left by them, the same rights that correspond to *"legitimate"* children. This section has no other effect in this case than the purpose for which it was designed: to declare as children of the mother's husband those born from her within the period fixed therein. As an assertion of a public policy which is based on the old maxim *"pater est is . . ."* and which with differing modalities we have sanctioned in the family law in all the codes, § 113 offers no conflict with the constitutional trend to dignify the human being in the equality of the children.

Where the support of a child is concerned, we are not now unaware of the urgent and essentially practical aspect of the problem. Our decisions show that we have always been very conscious of this interest of the minor. However, in cases such as the present one, where a minor is born of a married woman and given paternity by law—and what is decided here only covers this situation—another social interest evidenced by a clear and well-defined legislative policy precludes in law the use of the proceedings under § 263 of the Penal Code and Act No. 108 of 1940. It is rather incumbent on the Legislature to offer the desirable solution in this type of cases in the light of the different social interests involved, as has been done by the legislature of many other states where an analogous situation has arisen.

For the foregoing reasons the judgment on review shall be set aside and the record remanded to the trial court with instructions to dismiss definitively this criminal action.

---

MR. JUSTICE SERRANO GEYLS, with whom MR. JUSTICE SALDAÑA and MR. JUSTICE HERNÁNDEZ MATOS concur, dissenting.

In order to dispel the nebula created, in my judgment, by the opinion of the Court, it is necessary to state clearly forthwith the questions that are involved and the questions that are

not involved in this certiorari proceeding. The question involved is about a criminal action filed under Act No. 108 of April 30, 1940 (Sess. Laws, p. 672; 31 L.P.R.A. §§ 509–514) in which the state charges petitioner herein with the offense of abandonment of minors for having failed in his duty "to feed, clothe, support, educate, and provide shelter" (§ 1) to a son begotten by him in a woman married to another man. By express provision of the law this obligation exists with respect to "illegitimate children . . . whether acknowledged or not" (§ 1) and it is predicated exclusively on the fact of paternity (§§ 3, 4, 5, and 6). Proof of that fact need not conform to the provisions of the Civil Code as to an action of filiation. It is obvious, also, that the criminal nature of the action is neither extinguished nor mitigated by the fact that the Act permits the trial judge to suspend the judgment "under such conditions as he may consider it well to impose, for the welfare of the abandoned or neglected child . . . ." (Section 6.) The system of suspended sentences has already become a vital part of our procedure which is applicable in a great number of crimes, but which in no way alters or modifies the criminal nature of the action. 34 L.P.R.A. § 1027; *People* v. *Vélez*, 76 P.R.R. 135, 141 (1954).

This proceeding does not involve nor in any way refers to the filiatory relationship between the abandoned minor and the husband of the woman who conceived him. It is elementary in our law that civil filiation is neither established nor destroyed by a judgment rendered in a criminal action for abandonment of a minor and that said filiation must be again established in a civil action and by means extraneous to the criminal sentence. Notwithstanding these basic principles the court construed Act No. 108 together with the sections of the Civil Code relating to illegitimacy (§§ 113 to 117) and today establishes the following rule: In a criminal action for abandonment of minors under the aforesaid Act No. 108 (or § 263 of the Penal Code), a natural father of a child begotten by a woman married to another man can not be convicted

unless the legitimacy of the child is successfully challenged in a civil action pursuant to the aforesaid sections of the Civil Code.

In support of that rule it is urged that the criminal proceeding is not the adequate instrument to settle the controversy raised because "the action to be filed should permit [the child] pursuant to law to change from a filiatory status to another one with the proper adjudication of the rights of all the parties affected, including any conflict of interest between [the] minor and its own mother . . . ." Referring to §§ 113 to 116 of the Civil Code it adds that "another social interest, evidenced by a clear and well-defined legislative policy" precludes the use of the criminal proceedings and that it lies with the legislative branch "to offer the desirable solution."

I believe that the view taken by the Court is erroneous because (1) it is based on an interdependence of the civil and criminal actions which entirely lacks juridical basis; (2) it creates legal and practical problems as serious as those which are allegedly sought to be eliminated; (3) it places the adulterine children of married women, and as we shall see, other illegitimate children, on a position of disparity; (4) drawn to its logical conclusion it would destroy to a great extent the legislative purposes contemplated by the legislation dealing with abandonment of minors, and (5) it is at variance with the harsh social realities which, because of mass migration, are nowadays confronted by a considerable part of our people.

## I

In one of the first judgments rendered under § 263 of the Penal Code—*People* v. *Ferrán*, 26 P.R.R. 230, 232 (1918)—this Court, relying on the California case law, adopted the rule that "the provisions of the civil law in the premises in no way affect the interpretation to be given to the criminal

statute."[1]  This rule was expressly confirmed in *Rosario* v. *Suárez*, 67 P.R.R. 552, 556 (1947), adding that: ". . . Likewise the provisions of Act No. 108 of 1940 or of the Penal Code as to the abandonment of minors, should not affect the construction that should be given to the Civil Code . . . ." This principle of separation of the civil law from the criminal law was applied in numerous cases and the Court always protected the power of the state to compel the natural father to furnish support to his minor children, irrespective of the results in the civil jurisdiction.  In *People* v. *López*, 54 P.R.R. 279, 281 (1939), Mr. Chief Justice Del Toro said: ". . . We are dealing but with one offense the gist of which . . . is the voluntary and inexcusable abandonment of the children, whether they are of one kind or another . . . ."  In cases of this nature, he added, one can not ". . . place an unsurmountable stone wall before the path of justice that requires that the parents do not abandon their children, even though born in violation of the duties imposed by marriage and by virtue of criminal acts.  Should we adopt any other construction, we would pervert the purpose of the law and we would, in a certain way, reward a delinquent merely because he is one." (P. 284.)  And further: ". . . The duty of the father arises from the material fact that he is the father.  Once it has been duly proved that he is the father, and that so being he failed to discharge his duties in the manner established by the criminal law, the crime should be understood to have been committed." (P. 285.)

According to these postulates, the Court repeatedly rejected the theory under which it was sought to incorporate to the criminal action the requirements of proof of the civil action of filiation, particularly those enumerated in §§ 125 and 129 of the Civil Code.  *People* v. *Ortiz*, 67 P.R.R. 848

---

[1] It was used restrictively in this first case in order to deny support to an illegitimate child, on the ground that the criminal law, contrary to the civil law, was only applicable to legitimate children.

(1947) ; *People* v. *Rodríguez,* 67 P.R.R. 688 (1947) ; *People* v. *López,* 67 P.R.R. 732 (1947).

That judicial rule was firmly maintained for many years up to the, in my opinion, unfortunate judgment in *People* v. *Santiago,* 70 P.R.R. 798 (1950), which was expressly overruled in *Agosto* v. *Javierre,* 77 P.R.R. 444, 450 (1954). This rule is based on the classical principle of separation between civil and criminal actions sanctioned in our law and in our decisions.[2] Today, however, the court creates imaginary conflicts of interest between the mother and the child and states that as a consequence of the child's claim "he shall cease to be a member of a family with all the rights inherent to him therein in order to become a member of another family with other rights or none of them." However, it does not give the grounds for such statements nor does it indicate which provisions, whether substantive or adjective, or which legal doctrines would produce such a result. The truth is that those perils do not exist and that in this case, no matter what happens in the criminal action, the parent-child relationship in the civil sphere between the minor and his presumptive legitimate father shall continue intact. Actually, what the Court does in this case is to merge criminal and civil actions without adducing a single reason in support thereof and then derives dire consequences from such indefensible merger which is the product of its own doing.

The rule followed by a great majority of the American jurisdictions and the British Community maintains that "a judgment rendered in a criminal action, when offered in a civil action to establish the facts upon which it was rendered, is not admissible as evidence of such facts." 2 Wharton, Criminal Evidence (1955) § 640. That is also the rule in Puerto Rico although it has been applied to the whole criminal

---

[2] Section 2 of the Code of Civil Procedure, 32 L.P.R.A. § 2; *Ramírez* v. *Morales,* 69 P.R.R. 656 (1949); *Colón* v. *Secretary of the Treasury,* 79 P.R.R. 809 (1957).

record. *Ramírez* v. *Morales, supra; Colón* v. *Secretary of the Treasury, supra.* When the judgment is based on a plea of guilty it is admitted as an admission or confession of the person accused in the criminal prosecution, but never as conclusive evidence of the facts. The courts vary as to the probative value to be given to this evidence. Some require corroborative evidence while others grant it "great weight." Likewise, in a criminal action the general rule precludes the admission in evidence of a judgment rendered in a civil action if it seeks to prove by those means any of the facts on which the judgment is based.

To affirm in this case that the presumptive legitimate father is deprived of paternity as the result of the criminal action against another man, it must be maintained at the same time that in a civil action between the minor and his presumptive legitimate father, the judgment in the criminal case would constitute an absolute bar to the civil action or would constitute conclusive evidence of the facts on which said judgment is based. Such, however, would not be the case, not even in a civil action between the minor and the person convicted in the criminal prosecution and much less in a civil action in which the legitimate father is a party. In both cases, in view of the present state of our precedents already cited, the judgment in the criminal case could not be admitted in evidence.[3]

---

[3] *Cf. Chabrán* v. *Méndez*, 74 P.R.R. 719 (1953) where we held that a child is an indispensable party to a suit where his legitimacy is contested. In *González* v. *Pacific Greyhound Lines*, 214 P.2d 809 (Cal. 1950), a minor filed an action for damages for the wrongful death of his legitimate father. The defendant challenged the legitimacy of the child offering in evidence a divorce decree in which a court, in rendering an interlocutory order of custody and support, had decided, on the testimony of the mother, that the minor was not the child of his presumptive legitimate father. The Supreme Court of California held that the divorce decree and the interlocutory order were not admissible in evidence for any purpose because the minor had not been a party to the first suit and he was not bound by the determination of his status therein.

Detailed discussions of these problems, with ample citation of authorities and statutes, may be found in the following sources: 4 Wigmore,

In *Commissioner of Public Welfare* v. *Koehler*, 30 N.E.2d 587, 591 (N. Y. 1940), a situation similar to the present one was raised except that the applicable law expressly authorized the proceeding against the actual father in cases where the husband and wife were separated or where the husband was impotent. The Court of Appeals of New York said:

". . . Such a proceeding may be brought by the mother or . . . by a public official. Inferior Criminal Courts Act, § 64, subd. 1. The child is not a necessary party to the proceedings nor is the husband of the mother. The order made in such a proceeding does not constitute an adjudication binding on them or persons claiming through or under them that the child is or is not the legitimate offspring of married parents. An order adjudging that some person other than the mother's husband is the father of the child and ordering him to provide for its support is, it is plain, not a binding adjudication of illegitimacy. It does not establish the status of the child nor would it be competent evidence to establish illegitimacy in any proceeding to which others are parties."

Accordingly, the husband and wife were permitted to give testimony of their intimate relations, which they would not have been permitted to give in a proceeding adjudicating the status of the child. This is the rule that prevails in the state. *People* v. *Arcieri*, 167 N.Y.S.2d 437 (1959).

Hence, if we should declare the defendant guilty, it would lead at most, in this and other similar cases, to the existence of two actions against two different persons, which might result in the granting of support to the minor. In one, the

---

Evidence § 1346a (3d ed. 1940); Mueller & Whinery, *Second-Hand Judgments: Reciprocal Use of Judgments in Civil and Criminal Matrimonial Cases*, 15 Wash. and L. Rev. 44, 63–72 (1958); Zogg, *Judgments as Evidence Against One Not a Party to Them*, Wis. L. Rev. 307 (1946); 2 Wharton, *op. cit.* §§ 639, 640; Cowen, *The Admissibility of Criminal Convictions in Subsequent Civil Proceedings*, 40 Cal. L. Rev. 225 (1952); *Judgment in Bastardy Proceeding as Conclusive of Issues in Subsequent Bastardy Proceedings*, 37 A.L.R.2d 836 (1954); *Conviction or Acquittal as Evidence of the Facts on Which it was Based in Civil Action*, 18 A.L.R.2d 1287 (1951); American Law Institute, Model Code of Evidence, Rule 521, pp. 280–282 (1942); *cf. Admissibility of Traffic Conviction as Proof of Facts in Subsequent Action*, 50 Col. L. Rev. 529 (1950).

state would use the criminal action to prosecute the natural father to compel him to furnish support; in the other, the minor could, by way of a civil suit, require support from his putative legitimate father. Although undoubtedly this would create an anomalous situation,[4] it would not be to any lesser degree than others formerly sanctioned in the same field by our laws and authorities and it would have, as we shall see hereinafter, unassailable grounds of social equity.

In the past this Court has disregarded, in a criminal action, the formal elements of proof of the natural and illegitimate paternity required by the civil legislation (§§ 125 and 129 of the Civil Code) and established instead all the means of proof admitted by our law of evidence. As is well known it went as far as to sanction the principle that the testimony of the mother on sexual relations, if believed, is sufficient to support the finding of paternity. *People* v. *Mercado*, 69 P.R.R. 310 (1948) ; *People* v. *López, supra; People* v. *Bernabe*, 63 P.R.R. 385 (1944) ; *People* v. *De Jesús*, 57 P.R.R. 694 (1940) ; *People* v. *Dávila*, 53 P.R.R. 221 (1938). And no one, of course, thought that that declaration of paternity would work any effect on the juridical nexus between the parent and the child in the civil sphere. I do not believe

---

[4] Sections 113 to 117 of the Civil Code in force offer the presumptive legitimate father the means to challenge the legitimacy and, therefore, to put an end to such anomalous situation. The action in such cases "shall be instituted within three months after the inscription of its birth in the registry, if the husband be in Puerto Rico, or after six months if he should be abroad, reckoning from the time he has knowledge of the birth." (Section 117.) In the present case there is proof that the child was not registered but there is no proof that the husband knew of the birth. I have found nothing in our case law that indicates when the term of prescription begins to run under such circumstances. See on this problem: 5 Castán, *Derecho Civil Español, Común y Foral*, 34 (1958) ; 2 Martínez Ruiz, *El Código Civil*, 34 (1900) ; 3 Scaevola, *Código Civil*, 309 (1942) ; Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*, 346 (1947). It should be also borne in mind that the civil as well as the criminal action is based on the necessity of the support of the child and the capacity of the father to furnish such support. It is obvious that if the child receives adequate support from his presumptive legitimate father, the criminal action against the actual father would not lie.

that it can be contended that the public policy as to how and in which proceeding the legitimate paternity can be disputed and who may do so is more vital than the public policy as to how and in which proceeding the natural and illegitimate paternity can be proved and who may do so, unless, of course, it could be asserted at the same time that the former, notwithstanding the clear legislative and constitutional mandates holds in our system a more privileged position than the latter.

In adopting the principle of proof stated in the preceding paragraph there was recognized in Puerto Rico the existence of a type of children who had fathers for a single purpose only—support—but did not have them for all the other purposes. This situation of a child with a "fraction" of a father is as anomalous and perhaps as "antijuridical," as a child with one father and a "fraction" of another, which would be the case in extreme situations upon adopting a rule contrary to the one accepted today by the Court.[5]

Indeed, our legislation and all other legislations have been full of those anomalies because of the impact of the new ideas concerning the responsibility of the natural father and the traditional ideas concerning the illicitness and immorality of extramarital relations and the stigma on their offspring. To confirm this contention we need only remember the course

---

[5] In *Rodríguez* v. *Industrial Commission*, 58 P.R.R. 113 (1941), the question for decision before this Court was whether a daughter begotten by a man in a woman married to another was entitled to compensation for the death of his natural father in a labor accident. The girl had been registered as the legitimate daughter of her mother's husband. The petitioners alleged that the provisions of the Civil Code on legitimacy as well as the provisions of the Vital Statistics Act precluded the granting of compensation. The Court, speaking through Mr. Chief Justice del Toro, rejected those arguments. It held that it was exclusively a matter of dependency and added: "The decision of the Commission does not go beyond the compensation case itself. The record of the civil registry shall continue to exist unless it be annulled by a court with jurisdiction to do so according to law." As may be noted, this is also a case where the statute recognizes that a person is the "father" of a child for a very limited purpose, while for all other purposes it considers another person also as the "father" of the same child.

of our legislation on natural and illegitimate children from the beginning of the century up to the present time. Probably, the most extreme case was in 1945 when the Legislative Assembly decreed that certain children could be acknowledged by their father for the sole purpose of bearing their surname. (31 L.P.R.A. § 502.)

In taking the views which I have explained, the Court lost sight of the anomalies and "antijuridical" consequences that its judgments caused in the civil order, endeavoring to eliminate the patrimony of hunger which a contrary adjudication would impose on numerous children. That should also be our endeavor in the present situation.

## II

A study of the probable effects of the rule adopted today reveals the complex problems which it creates and how seriously unreal is its application. Three examples are sufficient:

a. A and B are married and a few months later are separated, without having any children. B, the husband, continues living in the same city as A.[6] After a few months of separation, A lives publicly and for several years in concubinage with C, a man who is in turn married to D. From this illicit union, but by no means less fecund, three children are born, which are acknowledged by C, but whom he later abandons. Applying the proposed rule to these facts it would follow that until such time as the legitimacy is successfully challenged, the husband will be held criminally liable for the

---

[6] It has been decided by our case law that "the physical non-access" (§ 113 of the Civil Code) on which the husband can challenge the legitimacy of a child does not exist when the husband and the wife live in the same city—*Cubano* v. *Del Valle*, 69 P.R.R. 538 (1949)—or in nearby towns—*Burgos* v. *Vázquez*, 48 P.R.R. 405 (1935); *Núñez* v. *Lacot*, 32 P.R.R. 76 (1923). Fortunately, the Court leaves today for future consideration the question of whether the rule of proof appearing in the second sentence of § 113 should be followed within its strict construction and in purely geographic terms.

abandonment of A's children, and the state could not prosecute C, the natural father, for abandonment. Furthermore, if C would have lived in concubinage with an unmarried woman, their children could have sued for support in a criminal action, but because he cohabited with a married woman the doors are closed.

*b.* A, a woman married to B, is separated from the latter and cohabits publicly with C, from whom she has three children. B continues living in the same town as A. After the children are born, A divorces B, marries C, and both acknowledge the children as their own. C abandons his children. Pursuant to the existing Act since 1947 (31 L.P.R.A. §§ 481–486) the three children are legitimized by the subsequent marriage of their parents to each other, counted from the date of marriage. However, the literal application of § 113 would make these children the legitimate children of B. Again, the proposed rule would preclude the state from prosecuting C for abandonment of his children until the question of legitimacy be elucidated in a civil action. If in the two previous examples B left Puerto Rico or his whereabouts were unknown, many months or perhaps years would elapse before the necessary procedural steps could be taken to terminate this action.

*c.* With the same facts of the first example, let us assume that one of the children of A and C is a girl, F, and that upon attaining 18 years of age her natural father commits the crime of incest with her. The corresponding criminal action is filed and the same defense, as in the present case, is presented—F is the legitimate daughter of A's husband and that legitimacy may only be challenged in a civil action. *Cf. People* v. *González*, 26 P.R.R. 379 (1918). After accepting that defense in a case for abandonment of children, I do not see how we can reject it in a case of incest, unless, of course, we would be willing to accept that the public policy as to the marriage between relatives is more important than the public policy for the support of children, something which, in my

opinion, is absolutely untenable. And we must add that if we validate in the incest case the rule adopted today, we would have to accept also that the daughter and the natural father could, under those circumstances, contract marriage.

I further believe that from the determination made today by the Court there also flow consequences of "antijuridicity", although perhaps with less dramatism than those indicated in the opinion of the majority. Let us see two examples:

A and B, both unmarried, live in public concubinage for several years and during that time A has two children. A certain day the mother files suit against C, under Act No. 108, alleging that he is the real father of her second child. It is clear that in the light of our precedents, the lower court would have to inquire into the paternity in order to determine whether C is the actual father and, if there is sufficient evidence, it would have to convict C. But it is obvious that under this situation "a proper adjudication of the rights of all the parties affected" could not be made because (1) there is the possibility of a conflict between the mother and the child due to the fact that the latter has an action of acknowledgment against paramour B, pursuant to § 125 of the Civil Code; (2) the paramour need not be heard, although he could allege that the child is his own and that he wants to acknowledge him; (3) there are the same actual probabilities (although not of presumption of law) of confusion of offspring as in the case of the husband.

The second example could complicate the situation more by establishing the fact that B, the paramour, had already voluntarily acknowledged the child before the criminal prosecution against B was filed. In this case there would also arise a conflict between the provisions of the Act [7] and the certain and natural fact of the paternity. Cf. García v. García et al., 18 P.R.R. 926 (1912); Alcaide v. Morales, 28 P.R.R. 258 (1920).

---

[7] Section 38 of Act No. 24 of April 22, 1931 (24 L.P.R.A. § 1237). Cf. Maldonado v. Warden, 73 P.R.R. 199 (1952).

What would we do in either of these two cases? Should we tell the child that he must elucidate those questions in a civil action of filiation where the two putative fathers be present or permit the ordinary criminal action, notwithstanding the anomaly and defects of "antijuridicity" but vindicating the public policy that "the obligation of the father arises from the material fact that he is the father?" I think that the second would be the only alternative. The judgment rendered today, however, is fundamentally contrary to that result.

### III

It is true that some American precedents have pronounced themselves in favor of the theory on which the opinion of the majority rests. But it is equally true that that case law is predicated on juridical concepts and social morals which by action of law and of the Constitution, and at least as to its legal purposes, we have long ago extricated from our system. Furthermore, it is also true that several jurisdictions have acted legislatively to eliminate the indisputable injustices that the aforesaid judicial decrees had created.

A positive example of the former is found in *In re Madalina*, 174 Cal. 693, 697; 164 Pac. 348 (1917), which is the main case on which the majority rests its opinion. The fundamental ground on which this judgment is based is that "the interests of public policy, decency, morality, and the protection of innocent children" would require that the state be precluded from challenging the paternity, because that challenge would be contrary to the "welfare, comfort, and happiness of innocent children . . . as they are protected against the stigma of illegitimacy, or aspersions cast upon their birth . . . ."[8] And in *State* v. *Randall*, 53 So.2d 689, 691

---

[8] California amended § 195 of the Civil Code and § 270 of the Penal Code in order to set aside the case of *Madalina* and permit the state to challenge the legitimacy in criminal cases for abandonment of children. The rules applicable to the civil litigation were not altered. 2 Armstrong,

(1951), also cited by the majority, the Supreme Court of Louisiana, in deciding that the criminal prosecution against the actual father did not lie, said:

". . . The sanctity with which the law surrounds marital relations and the reputation and good fame of the spouse and of the children born during their marriage is of such inviolability that the mother and the children can never brand themselves with declarations of adultery, illegitimacy, and bastardy, and their character is not permitted lightly to be thus aspersed, however true in themselves the stern and odious facts may unfortunately be."

It is evident, however, that the substance as well as the rhetoric of those pronouncements have been no longer effective for many years in our country. To confront the so-called stigma of illegitimacy, our country has raised, first with the rank of law, and later of the Constitution, the noble and human principle of equality of birth, by virtue of which "the innocent offspring [of illicit unions] should come to the world free of juridical disqualifications and inferiorities." Report of the Committee on the Bill of Rights to the Constituent Convention (1951). And to confront the hermetic rule of § 116 of the Civil Code which authorizes only the husband and his legitimate heirs to challenge the legitimacy of children born in wedlock, this Court, prompted by the same legal, constitutional and socially dignifying reasons, raised in *Agosto* v. *Javierre*, and now unanimously reaffirms, the right of those children to look for their actual parents via the civil law.[9] It is obvious that we would have never laid down that rule if we would have adopted the decisions approved today by the majority. By the same token we are compelled to reject the

---

*California Family Law* (1953), Supp. 1956 at 159, 162–163. See, also, the New York law cited in the *Koehler* case, *supra*, and the case of the District of Columbia, *Peters* v. *District of Columbia*, 84 A.2d 115 (D. C. Cir. 1951).

[9] Of course, in these cases there is no marriage to be saved because it has been shattered by the action of one or both parties. This idea is implicit in the approval which we give today to the civil proceeding as a vehicle to solve the problems under discussion.

American precedents stemming from other juridical and social conceptions, and to recognize to the state the power —which the applicable law in no way denies—to require those fathers, by means of the proper criminal proceedings, to comply with their natural and legal obligations.

Having discarded the American case law for the reasons noted, there only remains in support of the theory of the majority the apparent conflict between the public policy on the abandonment of children. The Court today decides that "conflict" in favor of the legitimacy, thereby denying to a great number of children the protection that the state contemplated for them in the criminal field.

I emphatically maintain that this conflict does not exist, and that if it did, the classical and inescapable function of the courts is to search for the interpretation which reasonably eliminates it, doing to the lawmaker the elementary justice that he never meant to approve contradictory enactments. The only way of accomplishing that result is to maintain the criminal proceeding strictly within its limited radius of action accessible to all children, irrespective of their birth origin, while the civil proceeding is reserved for settling status controversies.

That interpretation preserves untouched the principle of equality of birth, which is the essence of our legal institutions and of our collective aim. However, the rule adopted by the Court today places a great number of children, precisely because of their birth, in a position of legal inferiority and denies them a protection offered by the state to all others. In view of this result, a legislator with a literary inclination could well exclaim, paraphrasing the classical Orwellian irony that, "in Puerto Rico all children are equal, but some children are more equal than others."

## IV

I believe it is evident, considering some of the examples cited in this opinion, that the rule adopted by the Court today tends to a great extent to thwart the purposes underlying the enactment of Act No. 108 and § 263. That rule, of course, gains force and must be understood only in the light of the reasons on which it is based. The courts of first instance shall have to study those reasons in order to determine how they will fit to each situation of fact different from the one in question, although related thereto.

The reasons of this Court, as we noted previously, are principally based on the alleged defect of the criminal proceeding to decide all the conflicts presented by the situation, particularly those that arise between the mother and the child and between the actual father and the presumptive legitimate father. It is necessary for this reason, it is argued, to bring the matter within the civil sphere, in which, after duly summoning all the interested parties, a valid judicial adjudication may be made of all the rights and interests affected. It seems obvious to me that the logical application of that reasoning to other situations shall inevitably produce the removal from the criminal jurisdiction of every case in which the defendant alleges that he is not the father of the minor and where there exists the probability that another man is the father. Irrespective of whether that other man is the legitimate or illegitimate father, or, in the latter case, whether or not the child is officially acknowledged, as soon as there arises the probability that another person, not the defendant, may be the father of the minor, it is obvious that there shall arise conflicts of interests in the civil sphere between the mother and the minor and between the two presumptive fathers. The courts of first instance will be compelled, in that case, to suspend every action in such cases until said conflicts are settled in civil order.

The consequences of such reasoning for the due administration of Act No. 108 and § 263 of the Penal Code, are indeed of a serious nature. The legislative effort to eradicate the irresponsibility of the father by creating a speedy, simple, and efficient judicial instrument based on the coactive force of the state is thereby defeated in its application to hundreds of abandoned children.[10] To find relief to their most peremptory necessities, by demanding from their actual fathers compliance with the primary obligation stemming from paternity, those children will now have to avail themselves of the slow, complex, and costly civil proceeding required by an action of filiation;[11] they will suffer the anxiety of waiting for many months while the issues are decided and they shall pay the price of such delays with privations, illness, and juvenile

---

[10] The criminal action of abandonment of children is still the principal legal weapon that our community has to compel a father to comply with his duty towards his children. The statistics furnished by our Office of Courts Administration show the following:

DISTRICT COURT

Cases of Abandonment of Children and Appeals to the Superior Court

| Year | Pending | Filed | Convictions | Appeals | Rate of Appeals |
|------|---------|-------|-------------|---------|-----------------|
| 1956–57 | 1085 | 3136 | 1803 | 30 | 1.7 |
| 1957–58 | 1013 | 3404 | 1891 | 29 | 1.5 |
| 1958–59 | 1187 | 3249 | 2000 | 25 | 1.2 |

However, the action for support in the Superior Court during the year 1958–59 produced the following results: Pending: 514; Filed: 745; Decided: 733. There is no available information for the other years. A study made on December 1958 by the office of Statistics of the Division of Public Welfare concludes that "the abandonment, particularly of the male parent, increases as a cause of dependency of our children, especially in our needy classes" and that "the intervention of the courts in the cases of abandonment produces favorable results and if the latter could regulate the holding of hearings of fathers who abandon their children, a more efficient, economical, and social result could be obtained." Department of Health, Report on the Result of a Biennial Study on the Characteristics of the Cases Receiving Aid. (Mimeograph 1959, p. 5)

[11] These children cannot resort to the classical and summary action for support because the controversy can not be adequately decided in such an action either.

delinquency. The situation shall even become more pathetic for those children whose presumptive legitimate fathers have, as part of the enormous migratory current of the recent years, gone to live abroad.[12] They will feel the burden of the delays, of additional proceedings and of the intricate legal problems of jurisdictional restrictions and summons.[13]

---

[12] There is no data as to how many children shall meet such a situation. As a general index of the problem see the following figures, also furnished by our Office of Courts Administration, as to cases for support under the so-called Reciprocal Act:

### SUPERIOR COURT

Distribution of Cases for Support Under Act No. 71 of June 20, 1956
Fiscal Years 1956–57, 1957–58, and 1958–59

| Year | Puerto Rico as State of Origin * | | | | |
|------|------------------------|-------|------------------|-----------|------------------------------|
| | Pending on June 30 | Filed | Decided | | Pending at the end of the year |
| | | | On Its Merits | Dismissed | |
| 1956–57 | 1287 | 1613 | 1203 | 303 | 1394 |
| 1957–58 | 1394 | 1658 | 1438 | 103 | 1511 |
| 1958–59 | 1511 | 1623 | 1973 | 578 | 583 |

* It means that the claim for support is commenced in Puerto Rico and that the payment is obtained by collaboration of the courts of the state where the father is living.

[13] The fundamental question consists in deciding whether in a civil action where the legitimacy is challenged it is necessary to summon personally the presumptive legitimate father or if outside of Puerto Rico, whether the summons may be validly served on him by the publication of edicts. The question has not been decided by this Court. An old judgment rendered in *Orama* v. *Oyanguren*, 19 P.R.R. 788, 791 (1913), says that ". . . the courts of the country of a person who seeks to establish his civil status have jurisdiction over non-resident defendants, although they may not have been summoned personally therein nor possess property therein . . . ." However, the contrary rule prevails in several American jurisdictions. See *Hartford* v. *Superior Court*, 304 P.2d 1, 4–5 (Cal. 1956); *Conflicts of Laws, Personal Jurisdiction Over Alleged Father Required in Bastardy Proceedings*, 30 So. Cal. L. Rev. 336 (1956); *Parent and Child: Paternity Suit is an Action in Personam*, 4 U.C.L.A. L. Rev. 647 (1957); Ehrenzweig, *Conflict of Laws*, 80–119 (1959).

I can not, for the reasons noted, share the view of the majority. Reduced to its basic premise, that criterion means that the esthetic factors in the interpretation of the law are given a primary position while, in this case concretely, the correct solution is rejected for the so-called reasons of "anti-juridicity." Although the interest to maintain the symmetry of the law and the legal institutions is indeed a respectable one, I can not, by token of such pursuit, subscribe to an interpretation that destroys the legislative purposes and which is repugnant to the prevailing social realities. In my opinion the judgment appealed from should be affirmed.